## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BLUE CROSS AND BLUE SHIELD OF   :
OF NORTH CAROLINA,   :       Judge Griggsby
  :
       Plaintiffs,   :       Case No. 16-651C
  :
      v.   :
  :
THE UNITED STATES OF AMERICA,   :
  :
      Defendant.   :

---

## THE UNITED STATES' REPLY IN SUPPORT OF ITS MOTION TO DISMISS

---

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

RUTH A. HARVEY
Director
Commercial Litigation Branch

KIRK T. MANHARDT
Deputy Director

CHARLES E. CANTER
TERRANCE A. MEBANE
SERENA M. ORLOFF
FRANCES M. MCLAUGHLIN
L. MISHA PREHEIM
United States Department of Justice
Civil Division, Commercial Litigation Branch

*Attorneys for the United States of America*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................ii

INTRODUCTION ............................................................................................................ 1

ARGUMENT ................................................................................................................. 3

    I.    The Court Lacks Jurisdiction Because Full Payments Are Not Due Annually ................ 3

        A.    A "Presently Due" Claim Is a Prerequisite of Tucker Act Jurisdiction ................... 3

        B.    Final Risk Corridors Payments Are Not Presently Due ........................................... 5

            1.    HHS's Three-Year Framework Is Entitled to Deference ................................ 5

            2.    Because HHS's Three-Year Framework Is Reasonable, Additional
                Payments Are Not Presently Due .................................................................... 8

        C.    BCBSNC's Claims Are Not Ripe ......................................................................... 10

        D.    BCBSNC's Claims for 2015 and 2016 Are Improper ........................................... 11

    II.    Count I Fails to State a Claim Because Congress Intended That Risk Corridors
        Payments Be Limited to Collections ............................................................................... 12

        A.    Congress Intended the Risk Corridors Program to Be Self-Funded ...................... 13

        B.    Congress Restricted Risk Corridors Payments With the Intent That the
            Risk Corridors Program Be Budget Neutral While the Spending Laws
            Are in Effect ....................................................................................................... 15

    III.    BCBSNC Has Failed to State a Claim for Its Contract and Takings Claims ................. 21

        A.    BCBSNC Fails to State a Claim on Count II (Breach of Express Contract) .......... 21

        B.    BCBSNC Fails to State a Claim on Count III (Breach of Implied Contract) ......... 24

        C.    BCBSNC Fails to State a Takings Claims (Count V) Because It Had No
            Vested Property Interest in Risk Corridors Payments ........................................... 29

CONCLUSION ............................................................................................................. 30

## TABLE OF AUTHORITIES

Cases

*AAA Pharmacy, Inc. v. United States*,
    108 Fed. Cl. 321 (2012) ........................................................................................... 26

*Abbott Labs. v. Gardner*,
    387 U.S. 136 (1967) ................................................................................................. 10

*Adams v. United States*,
    391 F.3d 1212 (Fed Cir. 2004) ................................................................................ 30

*Am. Pelagic Fishing Co. v. United States*,
    379 F.3d 1363 (Fed. Cir. 2004) ............................................................................... 30

*ARRA Energy Co. I v. United States*,
    97 Fed. Cl. 12 (2011) .......................................................................................... 25, 26

*Auburn Hous. Auth. v. Martinez*,
    277 F.3d 138 (2d Cir. 2002) ..................................................................................... 18

*Baker v. United States*,
    50 Fed. Cl. 483 (2001) .............................................................................................. 27

*Bank of Guam v. United States*,
    578 F.3d 1318 (Fed. Cir. 2009) ............................................................................... 22

*Bath Iron Works Corp. v. United States*,
    20 F.3d 1567 (Fed. Cir. 1994) ................................................................................. 19

*Bell/Heery v. United States*,
    106 Fed. Cl. 300 (2012) ............................................................................................ 22

*Bell/Heery v. United States*,
    739 F.3d 1324 (Fed. Cir. 2014) ............................................................................... 22

*Brooks v. Dunlop Mfg. Inc.*,
    702 F.3d 624 (Fed. Cir. 2012) ....................................................................... 24, 25, 27

*Caraco Pharm. Labs., Ltd. v. Forest Labs., Inc.*,
    527 F.3d 1278 (Fed. Cir. 2008) ........................................................................... 10, 11

*Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*,
    400 F.3d 1352 (Fed. Cir. 2005) ................................................................................. 6

*Cessna Aircraft Co. v. Dalton*,
   126 F.3d 1442 (Fed. Cir. 1997) ........................................................................... 28

*Doe v. United States*,
   463 F.3d 1314 (Fed. Cir. 2006) ............................................................................. 3

*Fisher v. United States*,
   402 F.3d 1167 (Fed. Cir. 2005) .......................................................................... 3, 4

*Frymire v. United States*,
   51 Fed. Cl. 450 (2002) ........................................................................................ 25

*Greenlee Cty. v. United States*,
   487 F.3d. 871 (Fed. Cir. 2007) ........................................................................... 20

*Hanlin v. United States*,
   316 F.3d 1325 (Fed. Cir. 2003) ........................................................................... 25

*Hercules, Inc. v. United States*,
   516 U.S. 417 (1996) ............................................................................................ 28

*Highland Falls–Fort Montgomery Cent. Sch. Dist. v. United States*,
   48 F.3d 1166 (Fed. Cir. 1995) ............................................................................ 18

*HSH Nordbank AG v. United States*,
   121 Fed. Cl. 332 (2015) ...................................................................................... 29

*Kanag'iq Constr. Co. v. United States*,
   51 Fed. Cl. 38 (2001) .......................................................................................... 25

*Kanemoto v. Reno*,
   41 F.3d 641 (Fed. Cir. 1994) ................................................................................ 3

*King v. Burwell*,
   135 S. Ct. 2480 (2015) ..................................................................................... 7, 23

*Land of Lincoln Mut. Health Ins. Co. v. United States*,
   No. 16-744C, 2016 WL 6651428 (Fed. Cl. Nov. 10, 2016) ............................. passim

*Lummi Tribe of Lummi Reservation v. United States*,
   99 Fed. Cl. 584 (2011) .......................................................................................... 4

*Maryland Dep't of Human Res. v. Dep't of Health & Human Servs.*,
   763 F.2d 1441 (D.C. Cir. 1985) ........................................................................... 4

*Massie v. United States*,
  226 F.3d 1318 (Fed. Cir. 2000)............................................................................ 3

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  132 S. Ct. 2566 (2012)....................................................................................... 14

*Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.*,
  470 U.S. 451 (1985)............................................................................... 24, 25, 27

*New York Airways, Inc. v. United States*,
  369 F.2d 743 (Ct. Cl. 1966) .......................................................................... 26, 27

*Northrop Grumman Info. Tech., Inc. v. United States*,
  535 F.3d 1339 (Fed. Cir. 2008)......................................................................... 23

*Nuclear Energy Inst., Inc. v. Envtl. Prot. Agency*,
  373 F.3d 1251 (D.C. Cir. 2004) .......................................................................... 7

*Radium Mines, Inc. v. United States*,
  153 F. Supp. 403 (Ct. Cl. 1957)..................................................................... 26, 27

*Republic Airlines, Inc. v. U.S. Dep't of Transp.*,
  849 F.2d 1315 (10th Cir. 1988) ......................................................................... 18

*Rick's Mushroom Svc., Inc. v. United States*,
  521 F.3d. 1338 (Fed. Cir. 2008)..................................................................... 24, 28

*Roberts v. United States*,
  745 F.3d 1158 (Fed. Cir. 2014)............................................................................ 3

*Rodriguez v. United States*,
  480 U.S. 522 (1987).......................................................................................... 15

*Salazar v. Ramah Navajo Chapter*,
  132 S. Ct. 2181 (2012)....................................................................................... 20

*Sebastian v. United States*,
  185 F.3d 1368 (Fed. Cir. 1999).......................................................................... 22

*Schism v. United States*,
  316 F.3d. 1259 (Fed. Cir. 2002)..................................................................... 24, 28

*Shinnecock Indian Nation v. United States*,
  782 F.3d 1345 (Fed. Cir. 2015).......................................................................... 10

*Silverman v. United States*,
  679 F.2d 865 (Ct. Cl. 1982) ................................................................. 25

*Smithson v. United States*,
  847 F.2d 791 (Fed. Cir. 1988) .............................................................. 23

*Sperry Corp. v. United States*,
  13 Cl. Ct. 453 (1987) ........................................................................... 25

*St. Christopher Assoc., L.P. v. United States*,
  511 F.3d 1376 (Fed. Cir. 2008) ............................................................ 23

*Tennessee Valley Authority v. Hill*,
  437 U.S. 153 (1978) .............................................................................. 20

*Thompson v. United States*,
  174 Ct. Cl. 780 (1966) ......................................................................... 25

*Todd v. United States*,
  386 F.3d 1091 (Fed. Cir. 2004) .............................................................. 3

*Union Pac. R.R. Corp. v. United States*,
  52 Fed. Cl. 730 (2002) ......................................................................... 28

*United States v. King*,
  395 U.S. 1 (1969) ...................................................................... 3, 4, 5, 9

*United States v. Dickerson*,
  310 U.S. 554 (1940) ........................................................................ 18, 19

*United States v. Mitchell*,
  463 U.S. 206 (1983) ............................................................................... 4

*United States v. Mitchell*,
  109 U.S. 146 (1883) ............................................................................. 18

*United States v. Will*,
  449 U.S. 200 (1980) ............................................................................. 18

*Vargas v. United States*,
  114 Fed. Cl. 226 (2014) ....................................................................... 25

*Y.S.K. Const. Co. v. United States*,
  30 Fed. Cl. 449 (1994) ........................................................................... 6

v

Statutes

28 U.S.C. § 1491 ................................................................................................... 11

31 U.S.C. § 1501 ..................................................................................................... 8

42 U.S.C. § 1395w-115 ................................................................................. 6, 7, 14

42 U.S.C. § 1395w-116 ....................................................................................... 7, 14

42 U.S.C. § 18041 .......................................................................................... 6, 23

42 U.S.C. § 18042 ........................................................................................ 13, 27

42 U.S.C. § 18062 [Pub. L. No. 111-148 § 1342] .............................................. passim

42 U.S.C. § 18001 ........................................................................................... 13

42 U.S.C. § 18031 ........................................................................................... 13

42 U.S.C. § 18042 ........................................................................................... 13

42 U.S.C. § 18043 ........................................................................................... 13

42 U.S.C. § 18121 ........................................................................................... 13

Pub. L. No. 111-148 ........................................................................................ 13

Pub. L. No. 113-235 ........................................................................................ 17

Pub. L. No. 113-76 .......................................................................................... 15

Pub. L. No. 114-113 ........................................................................................ 17

Pub. L. No. 114-223 ........................................................................................ 18

Regulations

42 C.F.R. § 423.336(c) ......................................................................................... 6

45 C.F.R. § 153.510 .................................................................................... 24, 25

45 C.F.R. § 155.1010 ........................................................................................ 25

Patient Protection and Affordable Care Act; Exchange an Insurance Market
    Standards for 2015 and Beyond, 79 Fed Reg. 30,240 (May 27, 2014) ................................ 9, 29

Rules

RCFC 12(b)(6) ................................................................................................ 5, 12, 21, 22

Miscellaneous

*To the Adm'r, Veterans Admin.*,
    39 Comp. Gen. 422 (Dec. 4, 1959) ............................................................................ 8

160 Cong. Rec. H9838 (Dec. 11, 2014) ................................................................... 10, 17

S. Rep. No. 114-74 (2015) ........................................................................................ 18

*Honorable Jeff Sessions the Honorable Fred Upton*,
    B-325630, 2014 WL 4825237 (Sept. 30, 2014) ...................................... 13, 16, 17, 28

GAO, Principles of Federal Appropriations Law (GAO Redbook)
    (Vol. II) (3d ed. 2004) ............................................................................................. 8

GAO, *A Glossary of Terms Used in the Federal Budget Process*,
    GAO-05-734SP (Washington, DC Sept. 2005) ....................................................... 16

OMB Cir. No. A-25, *User Charges* (July 8, 1993) ...................................................... 16

Kate Stith, *Congress' Power of the Purse*,
    97 Yale L.J. 1343 (1988) ........................................................................................ 20

# INTRODUCTION

"No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. art. I, § 9, cl. 7.  Congress did not appropriate money for risk corridors payments when it enacted section 1342 in 2010, and for each of the years in which risk corridors payments could be made, Congress restricted the available funds to make such payments to risk corridors collections.  Congress's intent in restricting those funds is clear: the risk corridors program must be budget neutral for the years that the Spending Laws are in effect.  This clear congressional intent is dispositive of all issues before the Court.  The case should be dismissed.

Regarding the Court's jurisdiction, this case cannot proceed unless congressional enactments require Department of Health and Human Services ("HHS") to make full payments annually.  Section 1342 does not require such annual payments, and the Spending Laws do not permit them when risk corridors payment requests exceed risk corridors collections.  Thus, HHS has implemented an administrative framework in which it makes payments to the extent of its budget authority in each annual payment cycle, with final payment not due until the end of the program.   That framework, which HHS implemented in April 2014, reasonably fills a gap left by Congress when it authorized HHS to "establish and administer a program of risk corridors" without specifying payment deadlines, and Judge Lettow has already concluded that HHS's three-year framework is reasonable.  *Land of Lincoln Mut. Health Ins. Co. v. United States ("Land of Lincoln")*, No. 16-744C, 2016 WL 6651428, at *15-*19 (Fed. Cl. Nov. 10, 2016), *appeal docketed*, No. 17-1224 (Fed. Cir. Nov. 16, 2016).  Moreover, Congress has essentially blessed HHS's three-year payment framework in the legislative history to the 2015 Spending Law, stating that risk corridors payments will be made to the extent of collections "over the three year period

1

risk corridors are in effect."  BCBSNC has no claim for "presently due" money damages, as it must for the Court to exercise jurisdiction under the Tucker Act.

If the Court does not dismiss for lack of jurisdiction, then the Court must uphold HHS's pro-rata distribution of risk corridors payments and dismiss the case for failure to state a claim because BCBSNC is not presently entitled to additional payments under the three-year framework. As *Land of Lincoln* holds, "[s]ection 1342 . . . does not obligate HHS to make annual payments or authorize the use of any appropriated funds." *Id.* at *18.  Also, Congress's constitutional exercise of its power of the purse has limited the United States' liability under section 1342 to the extent of risk corridors collections.  As explained in the United States' Motion, Docket No. 10, a long line of Supreme Court and Court of Appeals cases recognizes that Congress can, through the annual appropriations process, limit the extent of the United States' obligations created in previously-enacted substantive legislation.  At all times, the question for the Court is whether, in either the substantive legislation enacting the obligation or the later appropriations law from which payments would be made, Congress clearly expressed its intent to limit the United States' liability to the amount appropriated.  When that intent is unequivocal and clear, as it is here, binding precedent requires that it be given effect.  Accordingly, Count I must be dismissed.

Finally, the Court in *Land of Lincoln* considered and dismissed the identical contracts and takings claims presented in BCBSNC's Complaint.  2016 WL 6651428, at *21-*25.  As explained in *Land of Lincoln*, the QHP Agreements do not obligate HHS to make risk corridors payments; no implied-in-fact contract obligates HHS to make risk corridors payments because nothing in section 1342 or HHS's regulations indicate any intent to contract; and QHP issuers such as BCBSNC have no vested property interest in risk corridors payments to support a claim under the Takings Clause.  Accordingly, counts II through V fail to state a claim and must be dismissed.

**ARGUMENT**

**I.    The Court Lacks Jurisdiction Because Full Payments Are Not Due Annually**

**A.    A "Presently Due" Claim Is a Prerequisite of Tucker Act Jurisdiction**

BCBSNC first contends that a "presently due" claim for money damages is not a prerequisite to jurisdiction under the Tucker Act.  The jurisdictional requirement that the money a plaintiff seeks under the Tucker Act be presently due was recognized by the Supreme Court in *United States v. King*, 395 U.S. 1, 3 (1969), and has been reaffirmed repeatedly by the Federal Circuit since then.  *See, e.g.*, *Todd v. United States*, 386 F.3d 1091, 1095 (Fed. Cir. 2004); *Massie v. United States*, 226 F.3d 1318, 1321 (Fed. Cir. 2000).  This "presently due" requirement applies to all claims for money damages, and not just to employee pay claims or claims seeking non-monetary relief, as BCBSNC suggests.  Pl.'s Opp'n at 19.

BCBSNC cites no controlling authority to support its assertion that "presently due" payment is not a jurisdictional requirement under the Tucker Act.  Instead, it relies on a series of cases concerning either the standard for identifying a money-mandating source of law (not at issue here) or disputes regarding a plaintiff's eligibility for payment under a money-mandating authority (also not at issue).  *See* Pl.'s Opp'n at 17-18 (relying on *Roberts v. United States*, 745 F.3d 1158 (Fed. Cir. 2014)).[1]  BCBSNC does not cite a single case in which the court exercised jurisdiction

---

[1] Because timing of payments was not at issue in *Doe v. United States*, 463 F.3d 1314 (Fed. Cir. 2006), or *Fisher v. United States*, 402 F.3d 1167 (Fed. Cir. 2005) (*en banc*), BCBSNC has misread those opinions.  *See* Pl.'s Opp'n at 18.  BCBSNC also quotes a paragraph from *Kanemoto v. Reno*, 41 F.3d 641, 644 (Fed. Cir. 1994).  Pl.'s Opp'n at 17.  *Kanemoto* concerned only the proper forum (as between the Court of Federal Claims and the District Court) for a plaintiff challenging an agency determination that she was ineligible for restitution under a federal statute.  The parties did not dispute that, if the claimant were eligible for payment as she claimed, payment was presently due.  In any event, if the Federal Circuit's statement in *Kanemoto* is to be read in the way BCBSNC contends, the statement cannot be reconciled with *King*, *supra*, and the court's more recent holdings affirming the "presently due" requirement as an independent element of jurisdiction.  *See, e.g.*, *Todd*, 386 F.3d at 1095; *Massie*, 226 F.3d at 1321.

where, under the rules and terms of the money-mandating authority at issue, payments were not yet due for *any participant*.  None of the cases BCBSNC cites discuss, much less abrogate, the "presently due" requirement, and nor could they, as the Supreme Court has interpreted the Tucker Act to include this requirement.  *King*, 395 U.S. at 3.

All of the cases cited by BCBSNC recite the traditional rule that Tucker Act jurisdiction will lie "only where the 'source of substantive law can fairly be interpreted as mandating compensation by the Federal Government for the *damages* sustained.'"  *See, e.g.*, *Lummi Tribe of Lummi Reservation v. United States*, 99 Fed. Cl. 584, 593 (2011) (emphasis added) (quoting *United States v. Mitchell*, 463 U.S. 206, 218 (1983)).[2]  Without a breach of a presently owed obligation, there can be no injury and, by definition, no "damages sustained."  *See Maryland Dep't of Human Res. v. Dep't of Health & Human Servs.*, 763 F.2d 1441, 1446 (D.C. Cir. 1985) ("The term 'money damages' . . . normally refers to a sum of money used as compensatory relief . . . for a *suffered loss*.") (emphasis added).  Moreover, it is the *court*—not the plaintiff—that interprets the substantive law to determine whether the plaintiff has a money-mandating source of compensation.  *Fisher*, 402 F.3d at 1173 ("If the court's conclusion is that the source as alleged and pleaded is not money-mandating, . . . the court shall dismiss the cause for lack of jurisdiction.").  And under *Chevron*, when interpreting an ambiguous statute, courts must defer to an agency's reasonable interpretation of that statute.  If, under the agency's reasonable interpretation of the statute, no payments are presently due, then the statute is not "fairly interpreted as mandating compensation," and the court lacks jurisdiction.[3]

---

[2] *Lummi Tribe* is not contrary (Pl.'s Opp'n at 20); rather, it cites the "presently" owing requirement expressly.  *Lummi Tribe of Lummi Reservation*, 99 Fed. Cl. at 595 n.10.

[3] *Land of Lincoln* concluded that "the court's jurisdictional analysis differs depending on whether

### B.       Final Risk Corridors Payments Are Not Presently Due

Additional risk corridors payments are not presently due.  As set forth in the United States'

Motion, at 16-18, section 1342 does not set payment deadlines, much less annual deadlines.  *Land*

*of Lincoln*, 2016 WL 6651428, at *16; *see also* Compl. ¶ 81 ("CMS did not impose a deadline for

HHS to tender full risk corridor payments to QHPs[.]").  Rather, the timing of payments is a gap

that Congress expressly authorized HHS to fill by granting it authority to "establish and

administer" the risk corridors program.  HHS exercised that authority by establishing, in April

2014, a three-year framework in which it makes payments each year based upon the amount of

"payments in," with final  "payments out" not due until the end of the program.[4]  *See* Compl. ¶

109 (acknowledging HHS's multi-year payment cycle).  Under this framework, BCBSNC is not

presently entitled to additional payments.[5]

### 1.       HHS's Three-Year Framework Is Entitled to Deference

A heightened "standard of deference applies if Congress either leaves a gap in the

construction of the statute that the administrative agency is explicitly authorized to fill, or

---

the plaintiff relies on a money-mandating statute" such that "presently due" is only a requirement when a plaintiff's claim is founded on a contract.  2016 WL 6651428, at *9.  The United States respectfully disagrees that such a distinction is warranted under either the text of the Tucker Act or Supreme Court precedent.  In any event, even if "presently due" is not a jurisdictional requirement, the absence of any present entitlement to additional payments would require dismissal under RCFC 12(b)(6).  *See id.* at *15-*19 (concluding that HHS's three-year payment framework is reasonable and granting judgment on Count I).

[4]  BCBSNC cites to earlier rulemaking in which HHS specifically declined to propose or adopt payment deadlines.  Compl. ¶ 84.  Those statements, which BCBSNC concedes were neither formally proposed nor adopted, *id.*, have no force of law.

[5]  On November 18, 2016, HHS announced that BCBSNC is calculated to receive risk corridors payments of $214,485,108.80 in the individual market and $827,984.90 in the small group market for the 2015 benefit year.  BCBSNC is expected to receive $4,898,870.47 towards its 2014 benefit year risk corridors request.        https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/2015-RC-Issuer-level-Report-11-18-16-FINAL-v2.pdf

implicitly delegates legislative authority, as evidenced by 'the agency's generally conferred authority and other statutory circumstances.'" *Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*, 400 F.3d 1352, 1361-62 (Fed. Cir. 2005) (citation omitted).  Here, Congress authorized agency gap filling in two independent provisions of the ACA.  First, by conferring on HHS the authority to "establish and administer" the risk corridors program, 42 U.S.C. § 18062(a), Congress explicitly authorized HHS to fill any gaps regarding the administration of the program—including the implementation of a collection and payment framework.  *Land of Lincoln*, 2016 WL 6651428, at *17; *see also Y.S.K. Const. Co. v. United States*, 30 Fed. Cl. 449, 458 (1994).  Second, through Congress's general direction that "[t]he Secretary shall . . . issue regulations setting standards for meeting the requirements under this title" and "take such actions as are necessary to implement such other requirements," Congress granted HHS general rulemaking authority in enacting the ACA.  42 U.S.C. § 18041(a), (c).

BCBSNC acknowledges that the Government "did not impose a deadline for HHS to tender full risk corridor payments to QHPs."  Compl. ¶ 81. BCBSNC suggests, however, that Congress directly spoke to the timing of payments merely because it provided in section 1342 that the ACA risk corridors program would be "based on" the one under Medicare Part D.  *See* Pl.'s Opp'n at 21-22.[6]  But Medicare Part D provides only that "[p]ayments under this section shall be based on such a method *as the Secretary determines*."  42 U.S.C. § 1395w-115(d) (emphasis added).  Thus, HHS is no more statutorily required to remit annual payments under Medicare Part D than it is under the ACA.  Moreover, while HHS has exercised its discretion under Medicare Part D to pay risk corridors payments on an annual basis, *see* 42 C.F.R. § 423.336(c), it is not required to adopt

---

[6] Although BCBSNC refers to Medicare Part D's legislative history, it cites none, but instead quotes the Medicare Part D statute itself (42 U.S.C. § 1395w-115(e)(3)(A)), which does not require annual payments.  Pl.'s Opp'n at 21.

an identical approach under section 1342 simply because Congress required the program to be "based on" Part D.  *See Land of Lincoln*, 2016 WL 6651428, at *17 (noting similarities and differences between section 1342 and Part D); *see also Nuclear Energy Inst., Inc. v. Envtl. Prot. Agency*, 373 F.3d 1251, 1269 (D.C. Cir. 2004) ("[t]here is no question that the phrase 'based on' is ambiguous") (citation omitted).  Indeed, HHS could not have structured the ACA risk corridors payments identically to those made under Medicare Part D because Congress did not enact identical language for making payments.  Whereas Congress enacted funding for Part D payments, Congress did not do so as part of section 1342.  *Compare* 42 U.S.C. §§ 1395w-115(a) (conferring budget authority "in advance of appropriations Acts") and 1395w-116 (authorizing "appropriations to cover Government contributions") (capitalization omitted), *with* 42 U.S.C. § 18062 (omitting any mention of government contributions).  In light of these statutory differences, "section 1342 does not require HHS to make full payments annually."  *Land of Lincoln*, 2016 WL 6651428, at *17.

BCBSNC also attempts to rely on *King v. Burwell*, 135 S. Ct. 2480 (2015), Pl.'s Opp'n at 21, in which the Supreme Court held that deference was not due to the IRS's interpretation of the statute because, "[i]n extraordinary cases, . . . there may be reason to hesitate before concluding that Congress has intended such an implicit delegation."  *Id.* at 2488-89.  This is not such an "extraordinary case."   Unlike in *King*, Congress's delegation of authority to HHS to "administer" section 1342 is explicit.  42 U.S.C. § 18062(a).  Furthermore, while the 3Rs programs serve an important role in achieving the goals of the ACA in its early years, the question here—when payments are due under section 1342—is not "central to th[e] statutory scheme."  *Id.* at 2489.  And whereas the Supreme Court concluded that the IRS "has no expertise in crafting health insurance policy of this sort," *id.*, HHS has precisely this type of technical expertise in administering a risk

7

corridors program (Medicare Part D) that the Supreme Court found lacking in *King*.  Accordingly, *Chevron* deference applies.  *Land of Lincoln*, 2016 WL 6651428, at \*17.

Finally, BCBSNC suggests that because HHS has recorded risk corridors payments as fiscal year 2015 obligations for budgeting purposes, the United States admits that it presently owes full payment as calculated under section 1342.  Pl.'s Opp'n at 1, 22.  This is incorrect.  To comply with federal appropriation law, agencies are required to charge obligations in the fiscal year in which they are incurred, including indefinite obligations.  *See generally* 31 U.S.C. § 1501; *see also, e.g.*, *To the Adm'r, Veterans Admin.*, 39 Comp. Gen. 422, 424 (Dec. 4, 1959) ("The general rule is that expenditures are properly chargeable to the appropriation for the fiscal year in which the liability therefor was incurred.").  As a result, agencies routinely record obligations that are not yet due, including certain obligations that may never come due.  GAO, Principles of Federal Appropriations Law (GAO Redbook) (Vol. II) at 7-8 (3d ed. 2004).  Moreover, "[i]f a given transaction is not sufficient to constitute a valid obligation, recording it will not make it one."  *Id.* (citations omitted).[7]

## 2.    Because HHS's Three-Year Framework Is Reasonable, Additional Payments Are Not Presently Due

"Section 1342 . . . does not obligate HHS to make annual payments."  *Land of Lincoln*, 2016 WL 6651428, at \*18.  HHS's three-year payment framework is, therefore, entitled to deference as a permissible construction of section 1342 that fills a gap in the statute left by Congress and reflects the agency's considered deliberation, including in notice and comment

---

[7]  BCBSNC also argues that HHS's framework is not entitled to deference because it is a "post-hoc litigation position."  Pl.'s Opp'n at 21.  But the three-year framework pre-dates this suit by two years, and "reflects the agency's deliberations and efforts through the rulemaking process."  *Land of Lincoln*, 2016 WL 6651428, at \*17.

rulemaking.  *Id.* at *17-*18.   Moreover, HHS's three-year, budget neutral interpretation "reasonably reflects" (1) the Congressional Budget Office's scoring of the ACA in 2010, (2) Congress's decision not to specifically appropriate funds for risk corridors payments, and (3) Congress's choice to omit from section 1342 the appropriation language used in the Medicare Part D statute.  *Id.* at *18.   Finally, the three-year framework is consistent with the subsequently enacted Spending Laws.

In contrast, BCBSNC's interpretation that section 1342 requires full, annual payments would disregard Congress's intent in passing the Spending Laws.   Indeed, the fact that payments and charges are calculated for a benefit year does not mean that full payments also are due each year.   As *Land of Lincoln* recognized, although section 1342 contemplates that QHPs report costs on an annual basis, "that arrangement reflects the year-by-year transitory aspect of the temporary risk corridors program."   2016 WL 6651428, at *16.   To be sure, HHS does operate an annual collection and payment cycle, and it remits payments on an annual basis to the extent possible.   79 Fed. Reg. 30,240, 30,260 (May 27, 2014).   But HHS defers payment to later years where the amount of collections does not permit it to make full payments in that year.   *Id.*   That deferral is a rational response to a shortfall in collections and Congress's express funding limitation.   BCBSNC points to no valid reason why annual *calculation* necessarily requires annual *payment* of those amounts, particularly given Congress's express funding limitations.

Nor is the three-year framework at odds with the purpose of the risk corridors program. BCBSNC contends that the "goal of the . . . program is to support [the Exchanges] by providing insurers with additional protection against uncertainty in claims cost during the first three years of the [Exchanges]."   *See* Pl.'s Opp'n at 21 (brackets in original).   Whether or not that is true, BCBSNC offers no reason why the "additional protection" provided by the statute must be in the

form of full annual payments, rather than partial payments spread out over the three years of the program. *Land of Lincoln*, 2016 WL 6651428, at *18. In any event, Congress foreclosed full annual payments by enacting budget limitations that, at present and in light of the shortfall in collections, both prevent HHS from making full annual payments and contemplate that payments may be made in any payment cycle across the "three year period risk corridors are in effect." 160 Cong. Rec. H9838 (Dec. 11, 2014). Because section 1342 does not require—and, in light of the shortfall in collections, the Spending Laws do not permit—full payment on an annual basis, the Court must defer to HHS's three year framework. *Land of Lincoln*, 2016 WL 6651428, at *18.

### C.     BCBSNC's Claims Are Not Ripe

Ripeness principles prevent courts, "through avoidance of premature adjudication, from entangling themselves in abstract disagreements[.]" *Shinnecock Indian Nation v. United States*, 782 F.3d 1345, 1348 (Fed. Cir. 2015) (citations omitted). Determining whether a dispute is ripe requires evaluation of: (1) the "fitness" of the disputed issues for judicial resolution; and (2) "the hardship to the parties of withholding court consideration." *Id.* (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967)). The issues here are not fit for judicial resolution. No present obligation has been breached, additional payments are forthcoming, and the amounts of those payments will be unknown until the program concludes. Until that time, the claims are necessarily abstract and premature because they cannot properly be resolved without further factual development (as to the amount of payments and collections across all three program years) and further legal development (as to the appropriations available for the final payment cycle of the program). Because those essential pieces of information would "significantly advance" the Court's ability to deal with the issues presented, the case is not ripe. *Caraco Pharm. Labs., Ltd. v. Forest Labs., Inc.*, 527 F.3d 1278, 1295 (Fed. Cir. 2008).

Nor would allowing these claims to ripen through the administrative and political processes result in hardship. Pl.'s Opp'n at 27. BCBSNC has been aware of the three-year framework since April 2014. Requiring it to abide by the terms of an administrative process, of which it has had notice for more than two years, cannot be hardship in the legal sense. Furthermore, deferring decision will not affect whether BCBSNC will offer QHPs in 2017; that decision has already been made. And BCBSNC's contention that abstention will "indefinitely delay[] resolution of [its] claims," Pl.'s Opp'n at 27, is unfounded: the risk corridors program is in the final quarter of its final year, and HHS will begin operating the final payment and collections cycle in 2017. Conversely, exercising restraint until the conclusion of the program permits resolution through administrative and political processes to the extent possible and conserves judicial resources should the dispute fail to move from conjectural to concrete. The case should be dismissed because BCBSNC's claims are not ripe.

### D.     BCBSNC's Claims for 2015 and 2016 Are Improper

Finally, even if the Court were to conclude that BCBSNC's claim for benefit year 2014 payments falls within its Tucker Act jurisdiction and is ripe, BCBSNC's request for declaratory relief for 2015 and 2016 must be dismissed. The Tucker Act does not empower this Court to issue declaratory relief except in specific statutorily defined circumstances, none of which apply here. 28 U.S.C. § 1491(a)(2), (b)(2). Furthermore, any declaratory relief issued by the Court must be "incident" and "collateral to" and necessary "to complete the relief afforded by" a money judgment within the Court's primary jurisdiction. *Id.* Even if BCBSNC presented a proper money claim for 2014 (it has not), its claims for 2015 and 2016 are not "incident" or "collateral to" its 2014 claim; those are independent claims that must be evaluated on their own facts, if and when they become

ripe.  The Court does not have jurisdiction to grant BCBSNC's request for declaratory relief.  *Land of Lincoln*, 2016 WL 6651428, at *11.

Because section 1342 does not require full, annual payments and because no additional payments are due under HHS's three-year framework before the end of the program, BCBSNC's claims are neither "presently due" nor ripe.  The case should be dismissed.[8]

## II.     Count I Fails to State a Claim Because Congress Intended That Risk Corridors Payments Be Limited to Collections

If the Court declines to dismiss this case for lack of jurisdiction or a justiciable claim, Count I should be dismissed under RCFC 12(b)(6).  As explained in the United States' Motion, Congress planned the risk corridors program to be self-funded, and confirmed that intention when it enacted the 2015 and 2016 Spending Laws, restricting risk corridors payments to collections.  Motion at 22-26.  And even if Congress's intent in enacting section 1342 were unclear, Congress's intent in enacting the Spending Laws is unambiguous: the risk corridors program must be budget neutral while those Spending Laws are in effect.  Motion at 26-30.  Because the Spending Laws have been in effect since the first year in which risk corridors payments could be made, congressional intent as embodied in those laws must govern.  Accordingly, the Court must uphold HHS's pro-rata distribution of risk corridors payments to issuers and dismiss Count I because Congress's constitutional exercise of its power of the purse has limited the United States' liability under section 1342 to the extent of collections.  Alternatively, if the Court concludes that the three-year framework is reasonable, then the Court can dismiss Count I under RCFC 12(b)(6) on that basis as well.  *Land of Lincoln*, 2016 WL 6651428, at *18-*19.

---

[8]  The United States' position in *Evergreen Health Cooperative, Inc. v. HHS*, No. 16-cv-2039 (D. MD), Pl's Opp'n at 18 n.36, is not contrary.  The United States does not dispute that this Court is the proper forum to resolve BCBSNC's claims if they ripen into presently due money damages.

### A.      Congress Intended the Risk Corridors Program to Be Self-Funded

As discussed in the United States' Motion, the structure of section 1342 contemplates a self-contained program "establish[ed] and administer[ed]" by HHS in which insurers that have lower-than-expected costs for a given year are required to make "payments in" to the program, and those payments are used to fund "payments out" to insurers that have higher-than-expected costs.  Indeed, while section 1342(b) outlines the formula for calculating risk corridors amounts, "payments in" are the only source of funding provided for "payments out."  Nothing in section 1342 or the ACA requires HHS to make up a shortfall in collections.  *Land of Lincoln*, 2016 WL 6651428, at *18.

When Congress enacted section 1342, it did not appropriate money for risk corridors payments.  *See id.* at *16 (citing *The Honorable Jeff Sessions the Honorable Fred Upton*, B-325630, 2014 WL 4825237, at *2 (Sept. 30, 2014) ("*GAO Op.*") ("Section 1342, by its terms, did not enact an appropriation to make the payments specified in section 1342(b)(1)")).  In contrast, Congress did appropriate funds for many other programs.  *See, e.g.*, 42 U.S.C. §§ 18001(g)(1), 18031(a)(1), 18042(g), 18043(c), 18121(b).  Congress also omitted from section 1342 the language that it frequently uses when it intends payments to be funded from the Treasury through the annual appropriations process.  *Land of Lincoln*, 2016 WL 6651428, at *16.  In such cases, it typically enacts an "authorization of appropriations" provision, as it did in dozens of other provisions in the ACA.  *See, e.g.*, Pub. L. No. 111-148, § 2705(f), 124 Stat. 119, 325 (2010) ("There are authorized to be appropriated such sums as are necessary to carry out this section.").[9]  The absence of either

---

[9]  *See also*, *e.g.*, *id.*, §§ 1002, 2706(e), 3013(c), 3504(b), 3505(a)(5), 3505(b), 3506, 3509(a)(1), 3509(b), 3509(e), 3509(f), 3509(g), 3511, 4003(a), 4003(b), 4004(j), 4101(b), 4102(a), 4102(c), 4102(d)(1)(C), 4102(d)(4), 4201(f), 4202(a)(5), 4204(b), 4206, 4302(a), 4304, 4305(a), 4305(c), 5101(h), 5102(e), 5103(a)(3), 5203, 5204, 5206(b), 5207, 5208(b), 5210, 5301, 5302, 5303, 5304, 5305(a), 5306(a), 5307(a), 5309(b).

an appropriation or an authorization of appropriations for section 1342 indicates that Congress understood that funding for risk corridors payments would come from risk corridors collections. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2583 (2012) ("Where Congress uses certain language in one part of a statute and different language in another, it is generally presumed that Congress acts intentionally.").

The absence of a separate funding mechanism for section 1342 also marked a distinct contrast with the already-existing risk corridors program under Medicare Part D, under which Congress expressly provided "budget authority in advance of appropriations Acts . . . to provide for the payment of amounts provided under this section."  42 U.S.C. § 1395w-115(a)(2); *see also* 42 U.S.C. § 1395w-116 (authorizing appropriations for Medicare Part D payments); *Land of Lincoln*, 2016 WL 6651428, at *17 (discussing differences between section 1342 and Part D). Consistent with Congress's omission of a separate funding mechanism for risk corridors, the CBO excluded the risk corridors program from its scoring at the time of the ACA's passage.  Congress then relied on this cost estimate to find that "this Act will reduce the Federal deficit between 2010 and 2019."  ACA § 1563(a)(1); *see also Land of Lincoln*, 2016 WL 6651428, at *16 (noting that the omission of risk corridors from CBO scoring "is significant" in light of Congress's reliance on scoring when enacting the ACA).

In sum, BCBSNC's argument that the United States is required to make full payments is inconsistent with section 1342's structure, the distinct absence in the ACA of any separate funding mechanism, and Congress's budgetary considerations at the time of the ACA's passage.  These indicia of congressional intent regarding the budgetary impact of section 1342 cannot be overcome with unsupported appeals to the general purpose of the program or the ACA because "no legislation pursues its purposes at all costs.  Deciding what competing values will or will not be

14

sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that whatever furthers the statute's primary objective must be the law." *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987). *See also Land of Lincoln*, 2016 WL 6651428, at *18.

### B. Congress Restricted Risk Corridors Payments With the Intent That the Risk Corridors Program Be Budget Neutral While the Spending Laws Are in Effect

Congress's intent as conveyed in the 2015 and 2016 Spending Laws is clear: the risk corridors program must be budget neutral for the years the Spending Laws are in effect. This intent is expressed in the course of events leading up to the enactment of the 2015 and 2016 Spending Laws, the prohibition in these laws on the use of transferred funds for risk corridors payments, and the legislative history explaining that the purpose of the prohibition is to ensure that the program is budget neutral.

As explained in the United States' Motion, at 10-11, in early 2014, the drafters of the Spending Law riders asked the GAO to identify the funding sources that could lawfully be used on risk corridors payments given the absence of any appropriation in the law itself. At the time, the Centers for Medicaid & Medicare Services ("CMS") Program Management appropriation provided, in full:

> For carrying out, except as otherwise provided, titles XI, XVIII, XIX, and XXI of the Social Security Act, titles XIII and XXVII of the PHS Act, the Clinical Laboratory Improvement Amendments of 1988, and *other responsibilities* of the Centers for Medicare and Medicaid Services, not to exceed $3,669,744,000, to be transferred from the Federal Hospital Insurance Trust Fund and the Federal Supplementary Medical Insurance Trust Fund, as authorized by section 201(g) of the Social Security Act; together with all funds collected in accordance with section 353 of the PHS Act and section 1857(e)(2) of the Social Security Act, funds retained by the Secretary pursuant to section 302 of the Tax Relief and Health Care Act of 2006; *and such sums as may be collected from authorized user fees* and the sale of data, which shall be credited to this account and remain available until September 30, 2019.

Pub. L. No. 113-76, div. H, title II, 128 Stat. 5, 374 (2014) (emphasis added).  Thus, the Program

Management appropriation, as then drafted, included a lump sum amount transferred from the

Federal Hospital Insurance Trust Fund and the Federal Supplementary Medical Insurance Trust

Fund, as well as funds collected by HHS under other specified statutory authority, including

"authorized user fees."  In fiscal year 2014, all of these funds could be spent, to the extent not

otherwise restricted, on unspecified "other responsibilities of [CMS]."

In response to the congressional inquiry, the GAO looked at this appropriation language

and concluded that risk corridors payments could constitute "other responsibilities of [CMS]" such

that the lump sum transferred to the Program Management appropriation from CMS trust funds

would have been available to make risk corridors payments had payments been due in fiscal year

2014.  *See GAO Op.*, 2014 WL 4825237, at *4-*5.  The GAO also opined that risk corridors

collections constituted "user fees" such that those collections also would have been available for

risk corridors payments under the language of the Program Management appropriation.[10]  The

GAO noted, however, that HHS would not collect risk corridors charges or make payments in

fiscal year 2014.  *GAO Op.*, 2014 WL 4825237 at *1, *5.  Therefore, risk corridors payments were

not one of HHS's "other responsibilities" that year, and the 2014 appropriations act did not

appropriate any funds for risk corridors payments.[11]  Thus, the GAO's conclusion that Program

---

[10]  As the GAO explained, "user fees" in the appropriations context are fees "assessed to users for goods or services provided by the federal government" and "apply to federal programs or activities that provide special benefits to identifiable recipients above and beyond what is normally available to the public."  *GAO Op.*, 2014 WL 4825237, at *4 (quoting GAO, *A Glossary of Terms Used in the Federal Budget Process*, GAO–05–734SP (Sept. 2005), at 100).  "Special benefits" include programs that "provide[] business stability or contribute[] to public confidence in the business activity of the beneficiary (*e.g.*, insuring deposits in commercial banks)."  *Id.* (quoting OMB Cir. No. A-25, at § 6a, *User Charges* (July 8, 1993) (emphasis altered)).

[11]  The 2014 Program Management appropriation provides that user fees collected in 2014 "remain

Management funds could be used for risk corridors payments was necessarily dependent on the enactment of similar appropriations laws in the years in which risk corridors payments would be made. *Id.* at *5.

In response to the GAO's conclusion, Congress passed the 2015 Spending Law, which included the same CMS Program Management appropriation, as stated above, but also provided:

> None of the funds made available by this Act from [CMS trust funds], or transferred from other accounts funded by this Act to the 'Centers for Medicare and Medicaid Services—Program Management' account, may be used for payments under section 1342(b)(1) of Public Law 111–148 (relating to risk corridors).

Pub. L. No. 113-235, div. G, title II, § 227 (2014).   Thus, through this appropriations rider, Congress limited the amount of funds available in the CMS Program Management appropriations for making risk corridors payments in that fiscal year to amounts derived from "such sums as may be collected from authorized user fees," which, for purposes of section 1342, consists of risk corridor collections.

In the accompanying Explanatory Statement, Congress indicated that the restriction was added "to prevent the CMS Program Management appropriation account from being used to support risk corridors payments."   160 Cong. Rec. H9838 (daily ed. Dec. 11, 2014).   Congress's intent was unchanged the following fiscal year, when it included an identical restriction in the 2016 Spending Law.  Pub. L. No. 114-113, div. H, title II, § 225 (2015).   The Senate Committee Report to the 2016 Spending Law stated that the funding limitation "requir[es] the administration to operate the Risk Corridor program in a budget neutral manner by prohibiting any funds from the Labor-HHS-Education appropriations bill to be used as payments for the Risk Corridor program."

---

available until September 30, 2019."  Pub. L. No. 113–76, Div. H, Title II, 128 Stat. 374.   User fees collected in subsequent fiscal years must be separately appropriated.  *GAO Op.*, 2014 WL 4825237, at *5.   The lump sum transferred to the Program Management appropriation expires at the end of the fiscal year.

Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriation Bill, 2016, S. Rep. No. 114-74, at 12 (2015).  It was under the 2016 Spending Law that HHS made its pro-rata payments in December 2015, and the provisions of the 2016 Spending Law continue in effect under a continuing resolution, Pub. L. No. 114-223, div. C (Sept. 29, 2016).  Thus, in the appropriations process for the first two fiscal years in which risk corridors payments could be made, Congress confirmed what was implicit in the structure of section 1342: risk corridors payments are funded solely from collections.

As the United States explained in its Motion, at 26-30, even if the Spending Laws are interpreted as limiting (rather than merely clarifying and confirming) the extent of HHS's payment obligations under section 1342, courts have long recognized that Congress can limit the United States' obligations in appropriations laws so long as it is clear regarding its intent to do so.  *See e.g.*, *United States v. Dickerson*, 310 U.S. 554 (1940); *United States v. Will*, 449 U.S. 200 (1980); *Highland Falls–Fort Montgomery Cent. Sch. Dist. v. United States*, 48 F.3d 1166 (Fed. Cir. 1995); *Republic Airlines, Inc. v. U.S. Dep't of Transp.*, 849 F.2d 1315 (10th Cir. 1988).  BCBSNC attempts to distinguish this case law based on minor differences in statutory language, Pl.'s Opp'n at 36-39, but BCBSNC misses the central point of these cases.  The question of whether a specific appropriations act limits the United States' liability does not depend on the use of specific words over other words; rather "[t]he whole question depends on the intention of congress as expressed in the statutes."  *United States v. Mitchell*, 109 U.S. 146, 150 (1883).[12]

---

[12] If congressional intent cannot be clearly discerned, a court must look to whether a later-enacted spending law can effectively be harmonized with an earlier-enacted statutory obligation.  *Auburn Hous. Auth. v. Martinez*, 277 F.3d 138, 145 (2d Cir. 2002).  If not, the court must give effect to the later-enacted law.  *Id.*

In this case, Congress did not intend to prohibit risk corridors payments entirely, and therefore, it did not use the language used in *Dickerson* or the different and unique language used in *Will* and the other cited cases.  Instead, as explained in the 2015 Explanatory Statement and 2016 Senate Committee Report, Congress intended only to limit risk corridors payments to the extent of collections.  By targeting the prohibition at monies transferred to the CMS Program Management appropriation from other sources, Congress ensured that monies deposited into the account from risk corridors collections would still be available for risk corridors payments.  Furthermore, the GAO had just informed Congress that the CMS Program Management account was the *only* source of funding potentially available for risk corridors payments under existing appropriations laws.  Thus, BCBSNC's attempt to distinguish controlling Supreme Court precedent based on immaterial differences in the text, where the congressional objective in those cases was different from the objective in this case, should be rejected.

In fact, the differences among the text of the appropriations law riders in each of the cited cases are at least as stark as the differences between the text in those cases and the text of the Spending Law riders here, yet in each case, the disparate provisions led courts to the same result. The explanation is simple: congressional intent, as expressed in both the text of the appropriations laws at issue and the legislative history of those laws, is the common thread connecting cases from the 19th century through the 20th century to this case.  Indeed, to ignore the legislative history in interpreting the Spending Laws would contravene binding precedent and be error.  *See Dickerson*, 310 U.S. at 562 (rejecting argument that Court should not consider legislative history of appropriations laws because where "[t]he meaning to be ascribed to an Act of Congress can only be derived from a considered weighing of every relevant aid to construction"); *see also Bath Iron Works Corp. v. United States*, 20 F.3d 1567, 1584 (Fed. Cir. 1994) (considering legislative history

of appropriations restriction).   BCBSNC does not cite a single non-contract case in which congressional intent to limit an obligation was clear and yet the court declined to give it effect.[13] BCBSNC cannot do so because the Supreme Court has been clear: where congressional intent to limit the United States' obligations is clear, that intent controls.

In short, this case does not concern a "mere failure of Congress to appropriate funds," *Greenlee Cty. v. United States*, 487 F.3d 871, 877 (Fed. Cir. 2007), a repeal by implication, *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 189-90 (1978), or an attempt to limit an existing contractual obligation, *Ramah Navajo*.   Instead, Congress, for the only fiscal years in which risk corridors payments could be made, enacted appropriations laws limiting the source of funds to make those payments.   "[A]ppropriations do not merely set aside particular amounts of money; they define the character, extent, and scope of authorized activities."   Kate Stith, *Congress' Power of the Purse*, 97 Yale L.J. 1343, 1356 (1988).   Thus, where Congress's intent is clear, the extent of the appropriation defines the extent of the program and, thus, the extent of the United States' obligation.

Here, Congress unequivocally expressed its intent to limit risk corridors payments to the amount of collections and thereby ensure that the program is budget neutral while those spending

---

[13] BCBSNC appears to concede that *Salazar v. Ramah Navajo Chapter*, 132 S. Ct. 2181 (2012), applies only to contractual obligations, Pl.'s Opp'n at 39-40.   As set forth in the United States' Motion, at 30-31, 32-42, the United States has no contractual obligation to make risk corridors payments, and BCBSNC has failed to state a claim on a contract theory.   *Land of Lincoln*, 2016 WL 6651428, at *19-*24.   In any event, Count I is based on the statute and implementing regulations, not contract, and nothing in the statute or regulations contains any mention or indication of contractual obligations.   Moreover, even assuming BCBSNC's express and implied contract theories had merit, they necessarily incorporate as contractual terms all applicable federal law, including the Spending Laws and HHS's three-year framework.   As a result, even if the United States had a contractual obligation to make risk corridors payments, that obligation would be limited to the extent of collections across the three-year cycle, just as is the statutory obligation. *Id.* at *24.   Thus, contrary to BCBSNC's suggestion, *Ramah Navajo* does not apply here and does not preclude dismissal of Count I.

restrictions are in effect.   Because BCBSNC has not refuted this congressional purpose, nor identified any other plausible purpose behind the Spending Law riders, its contention that the Spending Laws do not alter the United States' liability under section 1342, Pl.'s Opp'n at 35-39, is untenable.   BCBSNC has not cited any authority that would permit the Court to ignore the intent embodied in Congress's exercise of its Constitutional authority over the public fisc, and there is none.   Accordingly, Count I must be dismissed.

## III.   BCBSNC Has Failed to State a Claim for Its Contract and Takings Claims

As explained in the United States' Motion, at 32-42, HHS has no contractual obligation to make risk corridors payments.   In *Land of Lincoln*, the Court considered a nearly identical complaint to BCBSNC's Complaint.   *Compare* Complaint, Docket No. 1, *with Land of Lincoln*, Complaint, Docket No. 1.   Judge Lettow concluded that counts II through V fail to state a claim upon which relief can be granted, and dismissed them under RCFC 12(b)(6).   *Land of Lincoln*, 2016 WL 6651428, at *19-*24.   The Court's reasoning in *Land of Lincoln* is sound and equally applicable here:   counts II through V should be dismissed for failure to state a claim.

### A.   BCBSNC Fails to State a Claim on Count II (Breach of Express Contract)

As explained in the United States' Motion, at 32-37, the QHP Agreements have nothing to do with the risk corridors program, do not mention risk corridors payments, and instead merely set forth the privacy, security, and electronic transmission standards for QHPs that use the Federally-facilitated Exchange's electronic platform.   *See generally* Compl. Exhibits 2-4; *see also Land of Lincoln*, 2016 WL 6651428, at *20 (the QHP Agreements "reflect [the issuer's] agreement to comply with HHS's standards and the government's acceptance of [the issuer] into the [ACA's]

Exchange program").[14]   BCBSNC's two arguments—that sections II.d and V of the QHP Agreements incorporate an obligation to make full, annual risk corridors payments—are meritless.[15]

First, the plain language of section II.d does not contain any contractual commitment on behalf of HHS to make risk corridor payments.   And the context and surrounding provisions of section II.d confirm that "systems and processes" refer solely to the electronic systems and processes through which personally-identifiable information and other data flows between issuers and the Federally-facilitated Exchanges.   Section II.d does not encompass a duty to make risk corridors payments.   *See Land of Lincoln*, 2016 WL 6651428, at \*20 (finding, after considering the text, surrounding provisions, context, and Companion Guide, that the "'systems and processes' language [in the QHP Agreement] does not give rise to any risk corridors obligations").[16]

Second, section V's general reference to the "laws . . . of the United States" is insufficient to incorporate the risk corridors statute and regulation as terms of the QHP Agreement.   *See id.* at

---

[14]  BCBSNC is also incorrect to suggest that the QHP Agreements establish a contractual commitment to offer QHPs.  They do not.  Rather, the QHP Agreements merely require an issuer that has decided to issue QHPs on a Federally-facilitated Exchange platform to comply with specified electronic transmission standards.  *See generally* Compl. Exhibits 2-4.

[15]  Contrary to its assertions (Pl.'s Opp'n at 41), BCBSNC cannot withstand dismissal of this claim merely by alleging the existence of any contract with HHS; rather, it must identify a breach of *a duty* contained in that contract.  *Bell/Heery v. United States*, 739 F.3d 1324, 1330 (Fed. Cir. 2014).  The existence of such a duty is a legal question of contract interpretation appropriately resolved by the Court pursuant to RCFC 12(b)(6).  *See, e.g.*, *Bank of Guam v. United States*, 578 F.3d 1318, 1326 (Fed. Cir. 2009).

[16]  Because section II.b(3) of the QHP Agreements expressly incorporate the Companion Guide by reference, *Land of Lincoln*, 2016 WL 6651428, at \*20, and the Complaint incorporates the QHP Agreements by reference, the Companion Guide is part of the QHP Agreement and the Court may consider it on this motion to dismiss.  *See Bell/Heery v. United States*, 106 Fed. Cl. 300, 307-08 (2012), *aff'd*, 739 F.3d 1324 (Fed. Cir. 2014).  The Court also may consider the Companion Guide because it is a matter of public record.  *Sebastian v. United States*, 185 F.3d 1368, 1374 (Fed. Cir. 1999).

*21 ("[s]ection V.g[] does not incorporate the risk-corridors program into the agreement."). BCBSNC's contrary reading of this governing law clause (Pl.'s Opp'n at 43-44) has no merit; statutory and regulatory provisions are not incorporated into a contract with the government "unless the contract *explicitly* provides for the incorporation." *St. Christopher Assoc., L.P. v. United States*, 511 F.3d 1376, 1384 (Fed. Cir. 2008); *see also Northrop Grumman Info. Tech., Inc. v. United States*, 535 F.3d 1339, 1344 (Fed. Cir. 2008); *Smithson v. United States*, 847 F.2d 791, 794 (Fed. Cir. 1988).

In short, the provisions of section 1342 are not terms of the QHP Agreements. And even if this were not plain from the text of the Agreement, it is clear from the broader statutory scheme: the risk corridors program applies to all QHPs. 42 U.S.C. § 18062(a). But only a subset of QHPs (those participating on federal Exchange platforms and state Exchanges that connect to the federal platform) enter QHP Agreements with HHS. *See* Motion at 6, 30. Thus, to interpret the QHP Agreements to incorporate a risk corridors obligation would create an absurd result as a matter of programmatic design, whereby QHP issuers on federal platforms could enforce their rights in contract while those on state platforms could not. The Supreme Court has held that a legal interpretation under which the rights of participants on federal and state Exchanges would fundamentally differ should be rejected. *King*, 135 S. Ct. at 2483 (rejecting textual interpretation under which "State and Federal Exchanges would differ in a fundamental way" because 42 U.S.C. section 18041(c) "indicates that State and Federal Exchanges should be the same"); *see also Land of Lincoln*, 2016 WL 6651428, at *20, n.26 (noting the "inconsistent and unintended result where some [QHPs] have an allegedly express contractual basis for risk corridors payments, but others do not" and rejecting this "artificial policy distinction"). Thus, the stark asymmetry in rights that

would result from accepting BCBSNC's mistaken theory is not "irrelevant," as BCBSNC suggests, Pl.'s Opp'n at 42, n.85; rather, it demonstrates the error of BCBSNC's reasoning.

BCBSNC has failed to allege facts that could plausibly support a claim for breach of an express contract.  Count II should be dismissed for failure to state a claim.

### B.       BCBSNC Fails to State a Claim on Count III (Breach of Implied Contract)

BCBSNC concedes that its entire implied-in-fact-contract theory stands on three legs: "§ 1342, 45 C.F.R. § 153.510, and the Government's conduct before and after Plaintiff agreed to become QHPs for CY 2014."  Pl.'s Opp'n at 46; *see also* 49-50 (summarizing factual basis of claim as "the text of §1342 and implementation of its related regulations, plus Government's subsequent statements which incentivized [BCBSNC] to participate in the ACA Marketplace").[17] BCBCNC's tri-partite basis for its claim does not, as a matter of law, establish the requisite elements of an implied-in-fact contract.

First, regarding mutual intent, BCBSNC identifies nothing to overcome the presumption that Congress did not intend to bind itself contractually to make risk corridors payments, as it must to transform a statutory obligation into a contractual obligation.  *See Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 465-66 (1985); *Brooks v. Dunlop Mfg. Inc.*, 702 F.3d 624, 631 (Fed. Cir. 2012) (a party cannot overcome the presumption against intent to contract unless the language in the statute, regulation, or "the circumstances surrounding the statute's passage manifest[] any intent by Congress to bind itself contractually") (citing *Nat'l R.R.*

---

[17] Although BCBSNC can plead in the alternative (Pl.'s Opp'n at 50-51), it cannot base an implied contract on a subject matter that is already the subject of the express QHP Agreements.  *See, e.g.*, *Rick's Mushroom Svc., Inc. v. United States*, 521 F.3d 1338, 1344 (Fed. Cir. 2008); *see also Schism v. United States*, 316 F.3d 1259, 1278 (Fed. Cir. 2002) (*en banc*).

*Passenger Corp.*, 470 U.S. at 468-70).[18]  Indeed, nothing in the text of section 1342 or 45 C.F.R. § 153.510 is promissory or contractual in nature.  Congress did not demonstrate an intent to contract merely by providing for payment when an issuer satisfies certain conditions.  *See Land of Lincoln*, 2016 WL 6651428, at *23 (citing *Hanlin v. United States*, 316 F.3d 1325, 1328 (Fed. Cir. 2003); *ARRA Energy Co. I v. United States*, 97 Fed. Cl. 12, 27 (2011)).  As "[s]ection 1342 and the implementing regulations do not provide any express or explicit intent on behalf of the government to enter into a contract with qualified health plan issuers," *id.*, BCBSNC's claim for breach of an implied-in-fact contract fails at the outset.

BCBSNC's alleged reliance on HHS's statements and alleged "conduct" in rulemaking and guidance also fails to establish mutual intent; the only relevant "circumstances" for overcoming the presumption are those "surrounding the statute's passage," *Brooks*, 702 F.3d at 631, which HHS's proposed and final rulemakings—rendered years after the ACA's passage—are not.[19] Regardless, none of the statements or conduct cited by BCNSNC contain any language or indication of offer, acceptance, or contractual intent.[20]  HHS's statements simply recognize its pre-

---

[18]  None of the cases BCBSNC relies upon concerned the showing necessary to overcome the presumption against a statue being construed as a contractual undertaking.  *See Vargas v. United States*, 114 Fed. Cl. 226 (2014), *Frymire v. United States*, 51 Fed. Cl. 450 (2002), *Kanag'iq Constr. Co. v. United States*, 51 Fed. Cl. 38 (2001), *Sperry Corp. v. United States*, 13 Cl. Ct. 453 (1987), *Silverman v. United States*, 679 F.2d 865 (Ct. Cl. 1982), and *Thompson v. United States*, 174 Ct. Cl. 780 (1966).

[19]  BCBSNC's reliance on *ARRA Energy Company I*, Pl.'s Opp'n at 47-48, is misplaced, 97 Fed. Cl. 12, 27 (2011).  Consistent with *Brooks*, 702 F.3d at 631, the only "conduct" mentioned in *ARRA Energy Company I* was "the conduct of Congress and the President in enacting and signing the [statute]."  97 Fed. Cl. 12 at 27.

[20]  Raising arguments not alleged in its Complaint, BCBSNC now contends that intent to contract is evident from HHS's "conduct" of certifying BCBSNC as a QHP.  Pls.' Opp'n at 48, n.96.  Certification is not discretionary, but is merely ministerial: if an issuer satisfies the requirements, HHS certifies the issuer as a QHP.  *See* 45 C.F.R. § 155.1010; *see also*

existing, independent obligation to follow the statute and regulations; accordingly, they cannot support an inference of an intent to contract. *See AAA Pharmacy, Inc. v. United States*, 108 Fed. Cl. 321, 328 (2012).[21]

Second, an unambiguous offer and acceptance cannot be inferred from the language or circumstances of the risk corridors program. Pl.'s Opp'n at 48-50. "Section 1342 and the implementing regulations make no explicit reference to an offer or contract." *Land of Lincoln*, 2016 WL 6651428, at *23 (citing *AAA Pharmacy, Inc.*, 108 Fed. Cl. at 329 (finding a regulation providing for payment from the government did not create an implied-in-fact contract because it did not include any language manifesting either an offer or an intent to enter into contract); *ARRA Energy Co. I*, 97 Fed. Cl. at 27–28 (finding a statute did not create an implied-in-fact contract because it did not clearly express an intent to contract)). And HHS's rulemaking and guidance similarly contain no language that can plausibly be construed as an unambiguous offer.[22]

Nor do *Radium Mines, Inc. v. United States*, 153 F. Supp. 403, 405 (Ct. Cl. 1957), or *New York Airways, Inc. v. United States*, 369 F.2d 743, 751 (Ct. Cl. 1966), support BCBSNC's implied

---

https://www.cms.gov/cciio/programs-and-initiatives/health-insurance-marketplaces/qhp.html (describing the QHP application process). In any event, BCBSNC identifies nothing in the certification process from which the Court can plausibly infer an intent to contract.

[21] BCBSNC's claim that it relied "upon these statements . . . in the Federal Register" in its decision to become a QHP, Compl. ¶ 85; *see also* Pl.'s Opp'n at 46-47, is irrelevant because reliance is not an element of an implied-in-fact contract. *See Land of Lincoln*, 2016 WL 6651428, at *22, n.29 (rejecting an issuer's alleged reliance as a basis for an implied-in-fact contract claim).

[22] Furthermore, HHS's statements in the context of proposed rulemaking cannot constitute an unambiguous offer because those statements, by their nature, are subject to change. Contrary to BCBSNC's contention, Pl.'s Opp'n at 49, n.100, BCBSNC became certified as a QHP before HHS announced final rules for risk corridors payments, demonstrating that neither party considered the risk corridors program to be a contractual, as opposed to a statutory, obligation.

contract claim.  *See* Pl.'s Opp'n at 45.[23]  Unlike in *Radium Mines*, where the United States was

purchasing uranium ore pursuant to a regulation *explicitly* requiring a contract, or in *New York*

*Airways*, where the United States contracted for delivery of mail, here, the United States is not

procuring goods or services, but is administering a program.[24]  "In contrast" to "the facts of *New*

*York Airways*," here

> qualified health plans are not entitled to compensation solely by offering health
> insurance on the Exchange. The only health plans eligible for payment are those
> that suffer sufficiently high losses and submit those losses to the government. *See*
> 45 C.F.R. §§ 153.510(b), (g), 156.430(c). Even then, HHS has some discretion in
> determining when payments will be made because the risk-corridors program does
> not require full payments annually[.]

*Land of Lincoln*, 2016 WL 6651428, at *23.  Thus, while BCBSNC asserts it "accepted" HHS's

offer by becoming a QHP, "[s]ection 1342 and the implementing regulations do not constitute an

offer *or invite acceptance by performance alone*."  *Id.* (emphasis added) (citing *Baker v. United*

*States*, 50 Fed. Cl. 483, 489 (2001)).  Section 1342, its implementing regulations, and HHS's

rulemaking statements do not, as a matter of law, constitute an offer and acceptance in contract.

Third, BCBSNC cannot demonstrate authority to bind the United States in contract for risk

corridors payments.  Section 1342 directs HHS to establish and administer a "program" in which

all QHPs "shall participate."  42 U.S.C. § 18042(a).  Nothing in section 1342 or the ACA

authorizes any federal official to enter into a contract to make risk corridors payments.  Absent

---

[23]  To the extent BCBSNC urges the Court to read *Radium Mines*, or *New York Airways*,, as
suggesting that the Court can find an implied-in-fact contract merely from the terms and conditions
of a statutory program designed to fulfill the government's policy objectives, that reading cannot
be reconciled with the requirement that intent to contract must be found in the statute or regulation
itself or the circumstances surrounding enactment.  *See Nat'l R.R. Passenger Corp.*, 470 U.S. at
465-66; *Brooks*, 702 F.3d at 631; *Land of Lincoln*, 2016 WL 6651428, at *23.

[24]  BCBSNC's contention that it provided consideration by furthering a policy goal of the United
States has no limiting principle and lacks legal support.

statutory authority, no federal official can form a binding contract.  *See Schism*, 316 F.3d at 1288

(holding that neither Secretaries of the Armed Forces nor the President had authority to contract

with service members for free, lifetime healthcare).[25]   In addition, as explained *supra* at 16-17,

because risk corridors payments were not an obligation of HHS in 2014 (or earlier), the 2014

Program Management appropriation act did not appropriate any funds for risk corridors payments.

*GAO Op.*, 2014 WL 4825237 at *1, *5.  Hence, HHS did not have authority in 2013 or 2014 to

contract to make risk corridors payments in fiscal years 2015 or 2016 because "[a]s far as

government contracts are concerned," the Anti-Deficiency Act "'bars a federal employee or

agency from entering into a contract for future payment of money in advance of, or in excess of,

existing appropriation.'" *Cessna Aircraft Co. v. Dalton*, 126 F.3d 1142, 1449 (Fed. Cir. 1997)

(quoting *Hercules, Inc. v. United States*, 516 U.S. 417, 426 (1996)); *see also Land of Lincoln*, 2016

WL 6651428, at *24, n.30 (noting that after the Spending Laws, no budget authority exists and

that prior to the Spending Laws, even if budget authority existed, the Anti-Deficiency Act may

preclude the formation of a binding contract).  As a matter of law, BCBSC cannot establish

authority to contract for risk corridors payments.[26]

Finally, even if the QHP Agreement incorporated risk corridors obligations (it does not) or

an implied-in-fact contract for the payment of risk corridors was formed (it was not), BCBSNC

---

[25]   Because Congress did not grant authority to the Secretary of HHS to make risk corridors contracts, BCBSNC's new theories of implied authority and ratification, Pl.'s Opp'n at 51-53, necessarily fail.

[26]   Because risk corridors payments are based on issuers' losses and those losses cannot be determined in advance of the benefit year, under BCBNC's theory, any contract to make risk corridors payments would be an open-ended indemnification agreement.  Courts have relied on the Anti-Deficiency Act in refusing to find implied indemnification agreements and in rejecting express indemnification agreements.  *See, e.g.*, *Hercules, Inc.*, 516 U.S. at 427; *Rick's Mushroom Serv., Inc.*, 521 F.3d at 1346; *Union Pac. R.R. Corp. v. United States*, 52 Fed. Cl. 730, 732-34 (2002).

cannot establish that HHS breached a contractual obligation. *See Land of Lincoln*, 2016 WL 6651428, at *24 (assuming issuer could show that section 1342 and its implementing regulations "constituted a contractual offer relating to risk corridor payments that [the issuer] accepted," the issuer still could not state a claim for breach of contract). BCBSNC's contract theories seek to convert the risk corridors program into a contractual undertaking. But the program includes HHS's three-year payment framework. *See, e.g.*, Patient Protection and Affordable Care Act; Exchange and Insurance Market Standards for 2015 and Beyond, 79 Fed. Reg. 30,240 30,260 (May 27, 2014). Because any contractual obligation grounded in the QHP Agreements could extend no farther than what is required by statute and regulation, HHS cannot have breached such an agreement by making pro-rated payments to the extent of collections in conformity with its three-year payment framework. *Land of Lincoln*, 2016 WL 6651428, at *24.[27]

### C.  BCBSNC Fails to State a Takings Claims (Count V) Because It Had No Vested Property Interest in Risk Corridors Payments

BCBSNC's Takings claim rests entirely on the existence of a contract to make risk corridors payments. But as established above, BCBSNC has not plausibly alleged the existence of such a contract. *See also Land of Lincoln Mut. Health Ins. Co.*, 2016 WL 6651428, at *25 (rejecting Takings claim because no contract relating to risk corridors payments exists). As BCBSNC appears to concede, Pl.'s Opp'n at 56-58, an ordinary obligation on the part of the United States to pay money under a statutory benefits program does not give rise to a Fifth Amendment property interest. *Id.* (issuer's "statutory entitlement claim does not give rise to a

---

[27] BCBSNC's claim for breach of an asserted duty of good faith and fair dealing must be dismissed because BCBSNC cannot establish a contractual right with respect to risk corridors. *HSH Nordbank AG v. United States*, 121 Fed. Cl. 332, 341 (2015); *Land of Lincoln*, 2016 WL 6651428, at *24.

takings claim because [issuer] is not entitled to full payments annually, and because a statutory

right to payment is not a recognized property interest") (citing *Adams v. United States*, 391 F.3d

1212, 1225 (Fed Cir. 2004)).   The failure to establish a cognizable property interest forecloses a

Takings claim.  *Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004)

("If the claimant fails to demonstrate the existence of a legally cognizable property interest, the

court's task is at an end."). Count V should be dismissed.

## CONCLUSION

The United States' Motion to Dismiss should be granted, and the case should be dismissed.

Dated: November 22, 2016                        Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

RUTH A. HARVEY
Director
Commercial Litigation Branch

KIRK T. MANHARDT
Deputy Director

*/s/ Charles E. Canter*
CHARLES E. CANTER
FRANCES M. MCLAUGHLIN
TERRANCE A. MEBANE
SERENA M. ORLOFF
L. MISHA PREHEIM
United States Department of Justice
Civil Division, Commercial Litigation Branch
Telephone: (202) 616-2236
Facsimile: (202) 307-0494
Charles.Canter@usdoj.gov

*Attorneys for the United States of America*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 22nd day of November 2016, a copy of the foregoing, *The United States' Reply in Support of Its Motion to Dismiss*, was filed electronically with the Court's Electronic Case Filing (ECF) system.  I understand that notice of this filing will be sent to all parties by operation of the Court's ECF system.


*/s/ Charles E. Canter*
CHARLES E. CANTER
United States Department of Justice