# In the United States Court of Federal Claims

No. 16-651C
Filed: April 18, 2017
FOR PUBLICATION

| | |
|---|---|
| BLUE CROSS AND BLUE SHIELD OF NORTH CAROLINA, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| THE UNITED STATES, | ) ) |
| Defendant. | ) ) ) |

The Patient Protection and Affordable Care Act; Risk Corridors; RCFC 12(b)(1), Subject-matter Jurisdiction; RCFC 12(b)(6), Failure to State a Claim; Ripeness.

*Lawrence S. Sher*, Counsel of Record, Reed Smith LLP, Washington, DC; *Kyle R. Bahr*, Of Counsel, *Conor M. Shaffer*, Of Counsel, Reed Smith LLP, Pittsburgh, PA, for plaintiff.

*Charles E. Cantor*, Counsel of Record, *L. Misha Preheim*, Trial Attorney, *Frances M. McLaughlin*, Trial Attorney, *Marc S. Sacks*, Trial Attorney, *Terrance A. Mebane*, Trial Attorney, *Kirk T. Manhardt*, Deputy Director, *Ruth A. Harvey*, Director, *Chad A. Readler*, Acting Assistant Attorney General, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.

## **MEMORANDUM OPINION AND ORDER**

GRIGGSBY, Judge

## I.     INTRODUCTION

Plaintiff, Blue Cross and Blue Shield of North Carolina ("Blue Cross"), brings this action alleging statutory, breach of contract and takings claims against the United States to recover certain payments allegedly due under the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (Mar. 23, 2010) (the "ACA"). *See generally* Compl. The government has moved to dismiss this action for lack of subject-matter jurisdiction and for failure to state a claim upon which relief can be granted, pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"). *See generally* Def. Mot. For the reasons discussed below, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** the government's motion to dismiss.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background[1]

#### 1.  Overview

Plaintiff, Blue Cross, brings this action alleging statutory, breach of contract and takings claims against the government to recover certain payments allegedly due under the ACA's Risk Corridors Program.  *See generally* Compl.  The Risk Corridors Program is a three-year, temporary premium stabilization program, in which the government and Qualified Health Plans ("QHPs"), like Blue Cross, "share in the risk associated with the new marketplace's uncertainty for each of the temporary program's three years:  2014, 2015 and 2016" (the "Risk Corridors Program").  *Id*. at ¶¶ 6; *see also id*. at 33; 42 U.S.C. § 18062.  Blue Cross participated in the Risk Corridors Program during 2014, 2015 and 2016.  *Id*. at ¶¶ 34-44.  Under the Risk Corridors Program, Blue Cross and other QHPs may receive money from the United States Department of Health and Human Services ("HHS") to help reduce financial uncertainty during the initial years of the ACA.  Compl. at ¶ 21.  To date, Blue Cross has received only a portion of such payments for 2014 (the "Risk Corridors Program Payments").[2]  Compl. at ¶¶ 135-36.

Blue Cross asserts five claims in the complaint to recover the full amount of its 2014 Risk Corridors Program Payments.  First, Blue Cross alleges that the government violated Section 1342 of the ACA and its implementing regulations, 45 C.F.R. § 153.510, by failing to make full, annual Risk Corridors Program Payments to Blue Cross.  *Id*. at ¶¶ 154-65.  Second, Blue Cross alleges that the government also breached its QHP Agreement with the government by failing to make these payments in full, upon an annual basis.  *Id*. at ¶¶ 166-79.  Third, Blue

---

[1] The facts recited herein are taken from the complaint ("Compl."); the government's motion to dismiss ("Def. Mot."); the appendix to the government's motion to dismiss ("Def. App."); plaintiff's response thereto ("Pl. Opp."); and the government's reply brief ("Def. Reply").  Unless otherwise stated herein, the facts are undisputed.

[2] Plaintiff's Risk Corridors Program Payments and the governments pro-rated payment amounts for calendar year 2014 are as follows:

| Plaintiff | State / Market | Risk Corridor Amount | Prorated Amount | Percent Pro Rata |
|-----------|----------------|----------------------|-----------------|------------------|
| BCBSNC | NC / Individual | $147,421,876.38 | $18,601,495.60 | 12.6% |
| BCBSNC | NC / Small Group | $53,091.97 | $6,699.07 | 12.6% |

Compl. at ¶ 135.

Cross contends that the government also breached implied-in-fact contracts with Blue Cross to make full, annual Risk Corridors Program Payments.  *Id*. at ¶¶ 180-98.

In addition, Blue Cross contends that the government breached the covenant of good faith and fair dealing implied in its alleged express and implied contracts with the government, by failing to make these payments.  *Id*. at ¶¶ 199-210.  Lastly, Blue Cross alleges that the government has improperly taken its property interest in a statutory, regulatory and contractual right to receive full, annual Risk Corridors Program Payments, in violation of the Fifth Amendment of the United States Constitution.  *Id*. at ¶¶ 211-18.  Blue Cross also requests that the Court declare that the government must make full, annual Risk Corridors Program Payments for calendar years 2015 and 2016.  Compl. at Prayer for Relief.

### 2.  The Affordable Care Act

As background, Congress enacted the Patient Protection and Affordable Care Act in 2010.  *See* Pub. L. No. 111-148.  The goal of the ACA is to increase access to affordable, quality health insurance coverage for all Americans.  *King v. Burwell*, 135 S. Ct. 2480, 2485 (2015).

The ACA contains three key reforms to the health insurance system: (1) to prohibit health insurance companies from denying coverage or setting premiums based upon health status or medical history; (2) to require individuals to maintain health insurance coverage or make a payment to the Internal Revenue Service; and (3) to provide federal insurance subsidies in the form of premium tax credits and cost sharing reductions to make insurance more affordable to eligible consumers.  *Id*. at 2486-87 (citing 42 U.S.C. §§ 300gg, 300gg–1(a), 18081-82, 18091 (2016); 26 U.S.C. §§ 36B, 5000A (2016)); *see also* 42 U.S.C. § 18071 (2016).  To implement the aforementioned reforms, the ACA creates American Health Benefit Exchanges ("Exchanges"), which are virtual marketplaces in each state where individuals and small groups can purchase health insurance coverage.  42 U.S.C. §§ 18031-41 (2016).  The Exchanges provide, among other things, a centralized location for consumers to enroll in qualified health plans and competitive marketplaces for insurers to compete for business.  *Id.*

All plans offered through the Exchanges must be QHPs, meaning that such a plan must provide "essential health benefits" and comply with other regulatory parameters such as provider network requirements, benefit design rules, and cost sharing limitations.  *See* 42 U.S.C. § 18021;

45 C.F.R. §§ 155-56.  As part of the process to ensure that issuers that participate in the Exchanges comply with the ACA's requirements, HHS requires issuers to, among other things, execute an agreement known as a "Qualified Health Plan Certification Agreement and Privacy and Security Agreement" (the "QHP Agreement").  45 C.F.R. § 155.260(b)(2).  In the QHP Agreement, QHP issuers agree to, among other things, adhere to certain privacy and security standards when conducting transactions on the federally-facilitated Exchanges.  *Id.*; *see e.g.*, Compl. at Exs. 2-4.

### 3.  The Risk Corridors Program

Because the ACA introduced millions of previously uninsured individuals into the insurance markets, pricing uncertainties arose from the unknown health status of these additional enrollees and the fact that insurers could no longer charge higher premiums or deny coverage based upon an enrollee's health.  *See* 42 U.S.C. §§ 300gg, 300gg-1; 45 C.F.R. §§ 147.104-147.110; 78 Fed. Reg. 13406-01, 13432-33, 2013 WL 685066 (Feb. 27, 2013); Compl. at ¶¶ 4-5.  To mitigate the pricing risk and incentives for adverse selection arising from these changes, the ACA establishes three premium stabilization programs (the "3Rs") that have been modeled upon similar programs established under the Medicare Program.  *See* Compl. at ¶¶ 5, 7, 21.  The 3Rs began in 2014 and consist of the reinsurance, risk adjustment, and risk corridors programs.  *See generally* 42 U.S.C. §§ 18061-63.  The reinsurance and risk corridors programs expire after the third year of the new ACA Marketplace.  Pl. Opp. at 7.

Specifically relevant to this case, the Risk Corridors Program is authorized under Section 1342 of the ACA, which directs the Secretary of Health and Human Services (the "Secretary") to establish and administer the program under which qualifying health plans either pay money to, or receive money from, HHS based upon the ratio of insurance premiums to claims costs.  42 U.S.C. § 18062.  This program seeks to reduce financial uncertainty for QHP issuers during the initial years of the ACA.  *See* Compl. at ¶ 21.

Section 1342 provides, in pertinent part, that:

(a)  In general

The Secretary shall establish and administer a program of risk corridors for calendar years 2014, 2015, and 2016 under which a qualified health plan offered in the individual or small group market

shall participate in a payment adjustment system based on the ratio of the allowable costs of the plan to the plan's aggregate premiums. Such program shall be based on the program for regional participating provider organizations under part D of title XVIII of the Social Security Act [42 U.S.C. 1395w–101 et seq.].

42 U.S.C. § 18062(a) (brackets in original).  With respect to the methodology for making the Risk Corridors Program Payments, Section 1342 also provides that:

(b) Payment methodology

(1) Payments out

The Secretary shall provide under the program established under subsection (a) that if—

(A) a participating plan's allowable costs for any plan year are more than 103 percent but not more than 108 percent of the target amount, the Secretary shall pay to the plan an amount equal to 50 percent of the target amount in excess of 103 percent of the target amount; and

(B) a participating plan's allowable costs for any plan year are more than 108 percent of the target amount, the Secretary shall pay to the plan an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target amount.

(2) Payments in

The Secretary shall provide under the program established under subsection (a) that if—

(A) a participating plan's allowable costs for any plan year are less than 97 percent but not less than 92 percent of the target amount, the plan shall pay to the Secretary an amount equal to 50 percent of the excess of 97 percent of the target amount over the allowable costs; and

(B) a participating plan's allowable costs for any plan year are less than 92 percent of the target amount, the plan shall pay to the Secretary an amount equal to the sum of 2.5 percent of the target amount plus 80

> percent of the excess of 92 percent of the target amount over the allowable costs.

42 U.S.C. § 18062(b).  Under the payment methodology set forth in Section 1342, if a QHP issuer's allowable costs exceed the target amount by more than three percent, the issuer will receive a percentage of the difference in the form of a payment from HHS.  42 U.S.C. § 18062(b)(1).  Conversely, if a QHP issuer's allowable costs are less than the target amount by more than three percent, an issuer must pay a percentage of the difference in the form of a payment to HHS.  42 U.S.C. § 18062(b)(2).

HHS has also promulgated regulations to implement the Risk Corridors Program.  With regards to the Risk Corridors Program Payments made to QHP issuers, these regulations provide that:

> ### § 153.510 Risk corridors establishment and payment methodology.
>
> (a) *General requirement.* A QHP issuer must adhere to the requirements set by HHS in this subpart and in the annual HHS notice of benefit and payment parameters for the establishment and administration of a program of risk corridors for calendar years 2014, 2015, and 2016.
>
> (b) *HHS payments to health insurance issuers.* QHP issuers will receive payment from HHS in the following amounts, under the following circumstances:
>
> > (1) When a QHP's allowable costs for any benefit year are more than 103 percent but not more than 108 percent of the target amount, HHS will pay the QHP issuer an amount equal to 50 percent of the allowable costs in excess of 103 percent of the target amount; and
> >
> > (2) When a QHP's allowable costs for any benefit year are more than 108 percent of the target amount, HHS will pay to the QHP issuer an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target amount.

45 C.F.R. § 153.510(a)-(b).  Under these regulations, QHP issuers must compile and submit premium and cost data and other information underlying their risk corridors calculations to HHS after the close of each benefit year, and no later than July 31 of the next calendar year.  45 C.F.R.

§ 153.530(a)-(d).  HHS uses the data provided to calculate the charges and payments due to, and from, each issuer for the preceding benefit year under the Risk Corridors Program.  *See* 45 C.F.R. § 153.530(a)-(c); HHS Notice of Benefit and Payment Parameters for 2014, 78 Fed. Reg. 15,410-01, 15,473-74, 2013 WL 865946 (Mar. 11, 2013).  Although HHS's regulations provide that QHP issuers must submit the Risk Corridors Program Payments to HHS within 30 days of HHS's announcement of final charge amounts, neither Section 1342 nor its implementing regulations provide a specific deadline for HHS to make the Risk Corridors Program Payments to QHP issuers.  *See generally* 42 U.S.C. § 18062; 45 C.F.R. § 153.510.

### 4.   HHS's Rulemaking On The Risk Corridors Program Payments

Congress did not include an appropriation or an authorization of funding for the Risk Corridors Program in the ACA.  Def. Mot. at 8; Def. Reply at 13 (citation omitted); *see also* 42 U.S.C. § 18062; United States Government Accountability Office, Opinion Letter on Department of Health & Human Services-Risk Corridors Program to former Senator Jeff Sessions and Congressman Fred Upton, 2014 WL 4825237, at *2 (Sept. 30, 2014) ("Section 1342, by its terms, did not enact an appropriation to make the payments specified in section 1342(b)(1).").  And so, HHS has addressed funding for the program through rulemaking.  *See, e.g.*, *Standards Related to Reinsurance, Risk Corridors and Risk Adjustment*, 76 Fed. Reg. 41,930-01, 2011 WL 2728043 (proposed July 15, 2011); *Standards Related to Reinsurance, Risk Corridors and Risk Adjustment*, 77 Fed. Reg. 17,220-01, 2012 WL 959270 (Mar. 23, 2012); *HHS Notice of Benefit and Payment Parameters for 2014*, 78 Fed. Reg. 15,410-01, 2013 WL 865946 (Mar. 11, 2013); *HHS Notice of Benefit and Payment Parameters for 2015*, 79 Fed. Reg. 13,744-01, 13,787, 2014 WL 909454 (Mar. 11, 2014); *Exchange and Insurance Market Standards for 2015 and Beyond Final Rule*, 79 Fed. Reg. 30,240-01, 30,260, 2014 WL 2171429 (May 27, 2014); *HHS Notice of Benefit and Payment Parameters for 2016*, 80 Fed. Reg. 10,750-01, 10,779, 2015 WL 799390 (Feb. 27, 2015).

In this regard, the Secretary has interpreted Section 1342 to not require that HHS make full Risk Corridors Program Payments until the end of the three-year Risk Corridors Program.  Def. Mot. at 17.  Specifically, in July 2011, HHS published a proposed rule observing that the Congressional Budget Office ("CBO") "assumed [risk corridors] collections would equal payments to plans in the aggregate," when the CBO performed a cost estimate

contemporaneously with ACA's passage.  *Standards Related to Reinsurance, Risk Corridors and Risk Adjustment*, 76 Fed. Reg. at 41,948.  In the same proposed rule, HHS considered establishing deadlines for the Risk Corridors Program Payments made to issuers, as well as for the payments made to HHS.  *Id.* at 41,943.  But, in a final rule published on March 11, 2013, HHS established a 30-day deadline for only the Risk Corridors Program Payments that QHP issuers make to HHS.  *See HHS Notice of Benefit and Payment Parameters for 2014*, 78 Fed. Reg. 15410-01, 15,531, 2013 WL 865946 (Mar. 11, 2013) (codified at 45 C.F.R. § 153.510(d)).

HHS has also issued rulemaking on how to address the circumstance where payments owed by HHS exceed the collections received under the Risk Corridors Program.  As background, in February 2014, the CBO issued a report providing that: "[i]n contrast [to the reinsurance and risk adjustment programs], payments and collections under the risk corridors program will not necessarily equal one another . . . ."  CBO, The Budget and Economic Outlook: 2014 to 2024, at 59 (Feb. 2014), *available at* https://www.cbo.gov/sites/default/files/113th-congress-2013-2014/reports/45010-outlook2014feb0.pdf.  While the CBO projected that the Risk Corridors Program would result in $8 billion in net gain to the government, the CBO's report also acknowledged that "[i]f insurers' costs exceed their expectations, on average, the risk corridor program will impose costs on the federal budget . . . ."  *Id.* at 110.

On March 11, 2014, HHS issued a final rule stating that "[w]e intend to implement th[e] [risk corridors] program in a budget neutral manner, and may make future adjustments, either upward or downward to this program . . . to the extent necessary to achieve this goal."  *HHS Notice of Benefit and Payment Parameters for 2015 Final Rule*, 79 Fed. Reg. at 13,787; *see also id.* at 13,829 ("HHS intends to implement this program in a budget neutral manner."); *Exchange and Insurance Market Standards for 2015 and Beyond Proposed Rule*, 79 Fed. Reg. 15,808-01, 15,822, 2014 WL 1091600 (proposed Mar. 21, 2014) (same).  And so, HHS issued guidance explaining that it would make the Risk Corridors Program Payments to QHP issuers to the extent that these payments could be satisfied by the collections under the Risk Corridors Program.  Compl. at Ex. 20; *see also Exchange and Insurance Market Standards for 2015 and Beyond*, 79 Fed. Reg. at 30,260; *HHS Notice of Benefit and Payment Parameters for 2016*, 80 Fed. Reg. at 10,779.  On April 11, 2014, HHS also advised that any shortfall in payments would result in a pro-rata reduction of all the Risk Corridors Program Payments to QHP issuers.  Compl. at Ex. 20.

### 5.   Relevant Appropriations Legislation

In September 2014, the United States Government Accountability Office ("GAO") responded to an inquiry from former Senator Jeff Sessions and Representative Fred Upton regarding the availability of appropriations to make the Risk Corridors Program Payments. United States Government Accountability Office, Opinion Letter on Department of Health & Human Services-Risk Corridors Program to former Senator Jeff Sessions and Congressman Fred Upton, 2014 WL 4825237, at *1 (Sept. 30, 2014). The GAO's response to this inquiry provided that "the CMS [Program Management] appropriation for FY 2014 would have been available for making the payments pursuant to section 1342(b)(1)." *Id.* at *3.

On December 9, 2014, Congress enacted the Consolidated and Further Continuing Appropriations Act, 2015 (the "2015 Appropriations Act"), which addressed the budget authority for the Risk Corridors Program. Pub. L. No. 113-235, div. G, title II (2014). The 2015 Appropriations Act expressly limited the availability of Program Management funds for the Risk Corridors Program, as follows:

> None of the funds made available by this Act from [CMS trust funds], or transferred from other accounts funded by this Act to the "Centers for Medicare and Medicaid Services—Program Management" account, may be used for payments under section 1342(b)(1) of Public Law 111–148 (relating to risk corridors).

*Id.* at § 227. On December 18, 2015, Congress enacted an identical funding limitation with respect to the Risk Corridors Program in the Consolidated and Further Continuing Appropriations Act, 2016 (the "2016 Appropriations Act"). *See* Pub. L. No. 114-113, div. H, title II, § 225 (2015).

### 6.   Pro-Rata Reduction Of The Risk Corridors Program Payments

Due to the spending limitations imposed by Congress, HHS reduced the amount of its Risk Corridors Program Payments to QHP issuers. Specifically, on October 1, 2015, HHS announced that collections under the Risk Corridors Program for 2014 were expected to total $362 million, while payments calculated for the program totaled $2.87 billion. Def. Mot. at 13 (citing *Centers for Medicare & Medicaid Services, Risk Corridors Payment Proration Rate for 2014* (Oct. 1, 2015)). Because the amount of payments exceeded the collections, HHS also announced that the government would pay 12.6% of the Risk Corridors Program Payments

during the 2015 payment cycle.  *Id.*  In late 2015, HHS also issued a guidance explaining that HHS would make pro-rata Risk Corridors Program Payments, with "[t]he remaining 2014 risk corridors payments . . . made from 2015 risk corridors collections [in 2016], and if necessary, 2016 collections [in 2017]."  Def. Mot. at 13 (citing *Centers for Medicare & Medicaid Services, Risk Corridors Payments for the 2014 Benefit Year* (Nov. 19, 2015)); Compl. at Ex. 17

In November 2015, HHS began collecting the Risk Corridors Program Payments from QHP issuers for the 2014 benefit year.  Def. Mot. at 13.  In December 2015, HHS began remitting its pro-rata Risk Corridors Program Payments to QHP issuers, including Blue Cross. *Id.* at 13-14.

Although HHS is currently making pro-rata payments to QHP issuers under the Risk Corridors Program, HHS appears to have interpreted Section 1342 to require that full payments must be made.  *See* 45 C.F.R. § 153.510(b) ("QHP issuers *will* receive payment from HHS . . . .") (emphasis supplied); *Exchange and Insurance Market Standards for 2015 and Beyond*, 79 Fed. Reg. at 30,260 ("HHS recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers."); Compl. at Ex. 17 (same).  And so, HHS has committed to using funding sources other than the risk corridors collections to satisfy these outstanding payments, subject to the availability of appropriations at the conclusion of the program.  Def. Mot. at 9-10; s*ee also HHS Notice of Benefit and Payment Parameters for 2016*, 80 Fed. Reg. at 10,779; *Exchange and Insurance Market Standards for 2015 and Beyond*, 79 Fed. Reg. at 30,260; *HHS Notice of Benefit and Payment Parameters for 2014*, 78 Fed. Reg. at 15,473.  To that end, on September 9, 2016, HHS announced that:

> As we have said previously, in the event of a shortfall for the 2016 benefit year, HHS will explore other sources of funding for risk corridors payments, subject to the availability of appropriations. This includes working with Congress on the necessary funding for outstanding risk corridors payments.  HHS recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers.  HHS will record risk corridors payments due as an obligation of the United States Government for which full payment is required.

Def. App. at A248; *id*. at A144.

### 7.  Blue Cross's Risk Corridors Program Payments

To date, Blue Cross has received approximately $25 million of the Risk Corridors Program Payments that it is owed for 2014.  Compl. at ¶¶ 135-38.  Blue Cross submitted its calendar year 2014 risk corridors data to the Centers for Medicare and Medicaid Services ("CMS") in July 2015, and this data reflects that the government owes Blue Cross more than $140 million in Risk Corridors Program Payments for 2014.  Pl. Opp. at 12.  On November 2, 2015, Kevin J. Counihan, Director of CMS's Center for Consumer Information & Insurance Oversight and Chief Executive Officer of the ACA Marketplace, sent a letter to Blue Cross stating that, because the $362 million in risk corridors collections could not match the payment requests of $2.87 billion:

> [T]he remaining 2014 risk corridors claims will be paid out of 2015 risk corridors collections, and if necessary, 2016 collections. . . . . [W]e will not know the total loss or gain for the program until the fall of 2017 when the data from all three years of the program can be analyzed and verified.  In the event of a shortfall for the 2016 program year, HHS will explore other sources of funding for risk corridors payments, subject to the availability of appropriations. This includes working with Congress on the necessary funding for outstanding risk corridors payments.

Compl. at Ex. 18.  Mr. Counihan also stated that HHS "recognizes that the [ACA] requires the Secretary to make full payments to issuers, and that HHS is recording those amounts that remain unpaid following our 12.6% payment this winter as fiscal year 2015 obligations of the United States government for which full payment is required."  *Id.*

### B.  Relevant Procedural Background

Plaintiff commenced this action on June 2, 2016.  *See generally* Compl.  On September 30, 2016, the government moved to dismiss the complaint for lack of subject-matter jurisdiction, pursuant to RCFC 12(b)(1) or, in the alternative, for failure to state a claim upon which relief can be granted, pursuant to RCFC 12(b)(6).  *See generally* Def. Mot.

On October 31, 2016, plaintiff filed an opposition to the government's motion to dismiss. *See generally* Pl. Opp.  The government filed a reply in support of its motion to dismiss on November 22, 2016.  *See generally* Def. Reply.  On December 6, 2016 plaintiff, filed a sur-reply in support of its opposition to the government's motion to dismiss.  *See generally* Pl. Sur-Reply.

On February 13, 2017, the Court directed the parties to file supplemental briefs on the following issues: (1) whether the purpose of the Risk Corridors Program may only be fulfilled by the full, annual payment of the Risk Corridors Program Payments; (2) whether HHS's proposed rule dated March 23, 2012, 77 Fed. Reg. 17220-01, 17238, 2012 WL 959270 (Mar. 23, 2012), requires that HHS provide full, annual payment of the Risk Corridors Program Payments; (3) whether the Court should dismiss Count I of the complaint pursuant to RCFC 12(b)(6), if the Court concludes that plaintiff is not entitled to "presently due money damages" under Section 1342; and (4) whether the Court should dismiss Counts II-IV of the complaint, pursuant to RCFC 12(b)(6), if the Court concludes that plaintiff is not entitled to "presently due money damages" under Section 1342.[3] *See generally* Scheduling Order, Feb. 13, 2017.

On March 3, 2017, Blue Cross and the government filed their respective initial supplemental briefs.  Pl. Supp. Br.; Def. Supp. Br.  On March 17, 2017, Blue Cross and the government filed their respective responsive supplemental briefs.  Pl. Supp. Resp.; Def. Supp. Resp.  The Court held oral argument on the government's motion to dismiss on April 11, 2017.

The aforementioned matter having been fully briefed, the Court resolves the pending motion to dismiss.

## III.   LEGAL STANDARDS

### A.  Jurisdiction And RCFC 12(b)(1)

When deciding a motion to dismiss upon the ground that the Court does not possess subject-matter jurisdiction pursuant to RCFC 12(b)(1), this Court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor.  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also* RCFC 12(b)(1).  But, plaintiff bears the burden of establishing subject-matter jurisdiction, and plaintiff must do so by a preponderance of the evidence.  *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).  And so, should the Court determine that "it lacks jurisdiction over the subject matter, it must dismiss the claim."  *Matthews v. United States*, 72 Fed. Cl. 274, 278 (2006) (citations omitted); *see also* RCFC 12(h)(3).

---

[3] HHS's rule dated March 23, 2012, is a final rule.  *See Standards Related to Reinsurance, Risk Corridors and Risk Adjustment*, 77 Fed. Reg. 17220-01, 17238, 2012 WL 959270 (Mar. 23, 2012).

In this regard, the United States Court of Federal Claims is a court of limited jurisdiction and "possess[es] only that power authorized by Constitution and statute . . . ." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). The Tucker Act grants the Court jurisdiction over:

> [A]ny claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). The Tucker Act, however, is a "jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages. . . . [T]he Act merely confers jurisdiction upon [the United States Court of Federal Claims] whenever the substantive right exists." *United States v. Testan*, 424 U.S. 392, 398 (1976) (citation omitted). And so, to pursue a claim against the United States under the Tucker Act, a plaintiff must identify and plead a money-mandating constitutional provision, statute, or regulation; an express or implied contract with the United States; or an illegal exaction of money by the United States. *Cabral v. United States*, 317 F. App'x 979, 981 (Fed. Cir. 2008) (citing *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005)); *Norman v. United States*, 429 F.3d 1081, 1095 (Fed. Cir. 2005). "[A] statute or regulation is money-mandating for jurisdictional purposes if it 'can fairly be interpreted as mandating compensation for damages sustained as a result of the breach of the duties [it] impose[s].'" *Fisher*, 402 F.3d at 1173 (quoting *United States v. Mitchell*, 463 U.S. 206, 217 (1983)) (brackets in original).

### B. Ripeness

Even when the Court's jurisdiction over a claim has been established, the Court may not adjudicate a claim if the claim is not ripe for judicial review. *See, e.g.*, *Health Republic Ins. Co. v. United States*, 129 Fed. Cl. 757, 772 (2017); *Morris v. United States*, 392 F.3d 1372, 1375 (Fed. Cir. 2004) (citing *Howard W. Heck & Assocs., Inc. v. United States*, 134 F.3d 1468 (Fed. Cir. 1998)). To that end, "[r]ipeness is a justiciability doctrine that prevents the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Shinnecock Indian Nation v. United States*, 782 F.3d 1345, 1348 (Fed. Cir. 2015) (citations and internal punctuation omitted). This Court has also recognized that, while the ripeness doctrine

has been developed through Article III courts, the doctrine's principles are equally applicable in this Court. *See CW Gov't Travel, Inc. v. United States*, 46 Fed. Cl. 554, 557–58 (2000). And so,

> [a] court should dismiss a case for lack of ripeness when the case is abstract or hypothetical. . . . A case is generally ripe if any remaining questions are purely legal ones; conversely, a case is not ripe if further factual development is required.

*Rothe Dev. Corp. v. DOD*, 413 F.3d 1327, 1335 (Fed. Cir. 2005) (quoting *Monk v. Houston*, 340 F.3d 279, 282 (5th Cir. 2003)) (ellipsis existing).

In determining whether a dispute is ripe for review, the Court must evaluate two factors: "(1) the 'fitness' of the disputed issues for judicial resolution; and (2) 'the hardship to the parties of withholding court consideration.'" *Shinnecock*, 782 F.3d at 1348 (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1383-84 (Fed. Cir. 2012)). Under the first prong, "an action is fit for judicial review where further factual development would not 'significantly advance [a court's] ability to deal with the legal issues presented.'" *Caraco Pharm. Labs., Ltd. v. Forest Labs., Inc.*, 527 F.3d 1278, 1295 (Fed. Cir. 2008) (citing *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003)) (bracket existing). Under the second prong, "withholding court consideration of an action causes hardship to the plaintiff where the complained-of conduct has an 'immediate and substantial impact' on the plaintiff." *Id.* (citing *Gardner v. Toilet Goods Ass'n*, 387 U.S. 167, 171 (1967)).

### C.  RCFC 12(b)(6)

When deciding a motion to dismiss based upon failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(6), this Court must assume that all undisputed facts alleged in the complaint are true and draw all reasonable inferences in the non-movant's favor. *Erickson*, 551 U.S. at 94; *see also* RCFC 12(b)(6). To survive a motion to dismiss pursuant to RCFC 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). And so, when the complaint fails to "state a claim to relief that is plausible on its face," the Court must dismiss the complaint. *Iqbal*, 556 U.S. at 678 (citation omitted). On the other hand, "[w]hen there are well-pleaded factual

allegations, a court should assume their veracity" and determine whether it is plausible, based upon these facts, to find against defendant.  *Id*. at 679.

### D.  Statutory Interpretation

When interpreting a statute, the Court must "start[] with the plain language."  *Barela v. Shinseki*, 584 F.3d 1379, 1382-83 (Fed. Cir. 2009) (citation omitted).  Statutes are not, however, interpreted in a vacuum and the Court "must consider not only the bare meaning of each word but also the placement and purpose of the language within the statutory scheme."  *Id.* at 1383 (citation omitted).  And so, a statute's meaning, regardless of whether the language is "plain or not, thus depends on context."  *Id.* (citation omitted)

Generally, this Court must defer to an agency's interpretation of ambiguous statutory provisions, provided that the interpretation is reasonable.  *Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984).  When the Court reviews an agency's construction of a statute which it administers, the Court is confronted with two questions.  First, the Court examines "whether Congress has directly spoken to the precise question at issue."  *Id*. at 842.  If so, the Court "must give effect to the unambiguously expressed intent of Congress."  *Id*. at 842-43; *see also Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*, 400 F.3d 1352, 1362 (Fed. Cir. 2005).  If the statute is ambiguous, the Court must proceed to step two and examine "whether the agency responsible for filling a gap in the statute has rendered an interpretation that is based on a permissible construction of the statute."  *Doe v. United States*, 372 F.3d 1347, 1358 (Fed. Cir. 2004) (citations omitted); *see also Cathedral Candle Co.*, 400 F.3d at 1364-65.  And so, this standard of deference should apply, where "Congress either leaves a gap in the construction of the statute that the administrative agency is explicitly authorized to fill, or implicitly delegates legislative authority, as evidenced by 'the agency's generally conferred authority and other statutory circumstances.'"  *Cathedral Candle Co.,* 400 F.3d at 1361 (quoting *United States v. Mead Corp*., 533 U.S. 218, 229 (2001)).

In addition, courts generally accord *Chevron* deference when Congress has authorized an administrative agency to engage in rulemaking or adjudication that produces regulations or rulings for which the deference is claimed.  *Chevron*, 467 U.S. at 1361.  And so, in this instance, an agency's interpretation of its own regulations is also entitled to broad deference from the Court.  *Id*. at 1363-64.

### E.  Contract Claims Against The Government

To bring a valid contract claim against the United States in this Court, the underlying contract must be either express or implied-in-fact. *Aboo v. United States*, 86 Fed. Cl. 618, 626-27 (2009).  In addition, plaintiff bears the burden of proving the existence of a contract with the United States, and a plaintiff must show that there is "something more than a cloud of evidence that could be consistent with a contract to prove a contract and enforceable contract rights." *D & N Bank v. United States*, 331 F.3d 1374, 1377 (Fed. Cir. 2003).  To establish the existence of either an express or implied-in-fact contract with the United States, a plaintiff must show:  (1) mutuality of intent; (2) consideration; (3) lack of ambiguity in the offer and acceptance; and (4) actual authority to bind the government in contract on the part of the government official whose conduct is relied upon. *Kam-Almaz v. United States*, 682 F.3d 1364, 1368 (Fed. Cir. 2012); *see also Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997).  A government official's authority to bind the United States must be express or implied. *Roy v. United States*, 38 Fed. Cl. 184, 188-89, *dismissed*, 124 F.3d 224 (Fed. Cir. 1997).  And so, "the [g]overnment, unlike private parties, cannot be bound by the apparent authority of its agents." *Id*. at 187.

In this regard, a government official possesses express actual authority to bind the United States in contract "only when the Constitution, a statute, or a regulation grants it to that agent in unambiguous terms." *Jumah v. United States*, 90 Fed. Cl. 603, 612 (2009) *aff'd*, 385 F. App'x 987 (Fed. Cir. 2010) (internal citations omitted); *see also City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990) (citation omitted).  On the other hand, a government official possesses implied actual authority to bind the United States in contract "when the employee cannot perform his assigned tasks without such authority and when the relevant agency's regulations do not grant the authority to other agency employees." *SGS-92-X003 v. United States*, 74 Fed. Cl. 637, 652 (2007) (citations omitted); *see also Aboo*, 86 Fed. Cl. at 627 (implied actual authority "is restricted to situations where 'such authority is considered to be an integral part of the duties assigned to a [g]overnment employee.'") (quoting *H. Landau & Co. v. United States*, 886 F.2d 322, 324 (Fed. Cir. 1989)).  In addition, when a government agent does not possess express or implied actual authority to bind the United States in contract, the government

can still be bound by contract if the contract was ratified by an official with the necessary authority. *Janowsky v. United States*, 133 F.3d 888, 891–92 (Fed. Cir. 1998).[4]

### F. Takings Claims

Lastly, this Court may consider takings claims under the Fifth Amendment of the United States Constitution. *See* 28 U.S.C. § 1491; U.S. CONST. amend. V; *Morris v. United States*, 392 F.3d 1372, 1375 (Fed. Cir. 2004) ("[T]he Tucker Act provides the Court of Federal Claims exclusive jurisdiction over takings claims for amounts greater than $10,000."); *see also Jan's Helicopter Serv., Inc. v. FAA*, 525 F.3d 1299, 1304 (Fed. Cir. 2008) (citing *E. Enters. v. Apfel*, 524 U.S. 498, 520 (1998)). The Takings Clause of the Fifth Amendment guarantees just compensation whenever private property is "taken" for public use. U.S. CONST. amend. V. And so, the purpose of the Fifth Amendment is to prevent the "[g]overnment from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 123 (1978) (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)); *see also Florida Rock Indus., Inc. v. United States*, 18 F.3d 1560, 1571 (Fed. Cir. 1994).

To have a cause of action for a Fifth Amendment takings, a plaintiff must point to a protectable property interest that is asserted to be the subject of the takings. *See Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998) ("Because the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'") (citation omitted). In this regard, contract rights can be the subject of a takings action. *See e.g.*, *Lynch v. United States*, 292 U.S. 571, 579 (1934) ("Valid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States."); *see also United*

---

[4] Ratification may take place at the individual or institutional level. *SGS-92-X003*, 74 Fed. Cl. at 653-54. Individual ratification occurs when a supervisor: (1) possesses the actual authority to contract; (2) fully knew the material facts surrounding the unauthorized action of his or her subordinate; and (3) knowingly confirmed, adopted, or acquiesced to the unauthorized action of the subordinate. *Id.* at 654 (quoting *Leonardo v. United States*, 63 Fed. Cl. 552, 560 (2005)). In contrast, institutional ratification occurs when the government "seeks and receives the benefits from an otherwise unauthorized contract." *SGS-92-X003*, 74 Fed. Cl. at 654; *see also Janowsky v. United States*, 133 F.3d 888, 891–92 (Fed. Cir. 1998).

*States v. Petty Motor Co.*, 327 U.S. 372, 380-81 (1946) (holding that plaintiff was entitled to compensation for government's takings of an option to renew a lease).

## IV.   LEGAL ANALYSIS

The government has moved to dismiss this matter for several reasons.  First, the government argues that the Court should dismiss Blue Cross's claim based upon Section 1342 and its implementing regulations upon the ground that Blue Cross has no right to "presently due" money damages under these provisions, pursuant to RCFC 12(b)(1) or, alternatively, pursuant to RCFC 12(b)(6).  Def. Mot. at 14-31; Def. Supp. Br. at 5-8.  Second, the government argues that the Court should dismiss Blue Cross's statutory, breach of contract and takings claims upon the ground that these claims are not ripe, because HHS has not yet determined the total amount of the Risk Corridors Program Payments that Blue Cross will receive.  Def. Mot. at 21-22.

In addition, the government has moved to dismiss Blue Cross's statutory claim for failure to state a claim upon which relief can be granted, because Section 1342 does not mandate the Risk Corridors Program Payments in excess of amounts collected, or impose a contractual obligation upon the government.  *Id*. at 22-31; Def. Supp. Br. at 5-8.  The government has also moved to dismiss Blue Cross's contract and takings claims for failure state a claim upon which relief can be granted, because: (1) HHS has no contractual obligation to make the Risk Corridors Program Payments and (2) Blue Cross has no vested property right to full, annual Risk Corridors Program Payments.  Def. Mot. at 32-44.  Lastly, the government also seeks the dismissal of Blue Cross's request for declaratory relief in this matter, because such relief would not be collateral or incidental to a money judgment in this action.  *Id*. at 44.

For the reasons discussed below, the Court possess subject-matter jurisdiction to entertain Blue Cross's statutory, contract and takings claims.  But, Blue Cross fails to state plausible claims for relief with respect to these claims.  And so, the Court must dismiss these claims pursuant to RCFC 12(b)(6).

In addition, the Court must dismiss Blue Cross's request for declaratory relief because the relief that Blue Cross seeks is neither incidental nor collateral to any judgment for monetary relief in this matter.  RCFC 12(b)(1).  And so, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** the government's motion to dismiss.

### A.  The Court Possesses Jurisdiction To Consider Plaintiff's Claims

### 1.  The Court May Consider Blue Cross's Statutory Claim

As an initial matter, the Court possesses jurisdiction to consider Blue Cross's claim alleging a violation of Section 1342 and its implementing regulations.  *See generally* Compl. at ¶¶ 154-165.  In the complaint, Blue Cross alleges that HHS has violated Section 1342 and its implementing regulations, by failing to make full, annual Risk Corridors Program Payments.  *Id.*; 42 U.S.C. § 1342; 45 C.F.R. § 153.510.  Because Section 1342 and its implementing regulations are money-mandating sources of law, the Court possesses jurisdiction to consider Blue Cross's claim.

It is well established that to pursue a claim for monetary relief against the government, Blue Cross must plead a money-mandating source of law.  *See Cabral v. United States*, 317 F. App'x 979, 981 (Fed. Cir. 2008) (citing *Fisher*, 402 F.3d at 1172).  A source is money-mandating when it "can fairly be interpreted as mandating compensation by the [government]." *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003) (citing *Mitchell*, 463 U.S. at 217).  And so, a source is money-mandating if it is "reasonably amenable to the reading that it mandates a right of recovery in damages."  *ARRA Energy Co. I v. United States*, 97 Fed. Cl. 12, 19 (2011) (quoting *White Mountain Apache Tribe*, 537 U.S. at 473).  In contrast, a source is not money-mandating when it provides the government with "complete discretion" regarding whether it will make payments.  *Doe v. United States*, 463 F.3d 1314, 1324 (Fed. Cir. 2006) (citations omitted); *see ARRA Energy Co. I*, 97 Fed. Cl. at 19 (noting that the determination of whether a source is money-mandating "generally turns on whether the government has discretion to refuse to make payments under that [source].").

In this case, Section 1342 provides that if "a participating plan's allowable costs for any plan year are more than 103 percent but not more than 108 percent of the target amount, the Secretary *shall pay* to the plan an amount equal to 50 percent of the target amount in excess of 103 percent of the target amount."  42 U.S.C. § 18062(b)(1) (emphasis supplied).  This statute further provides that if "a participating plan's allowable costs for any plan year are more than 108 percent of the target amount, the Secretary *shall pay* to the plan an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target amount."  *Id.* (emphasis supplied).

Section 1342's implementing regulations also provide that "[w]hen a QHP's allowable costs for any benefit year are more than 103 percent but not more than 108 percent of the target amount, HHS *will pay* the QHP issuer an amount equal to 50 percent of the allowable costs in excess of 103 percent of the target amount" and that "[w]hen a QHP's allowable costs for any benefit year are more than 108 percent of the target amount, HHS *will pay* to the QHP issuer an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target amount."  45 C.F.R. § 153.510(b) (emphasis supplied).

The aforementioned provisions are plainly money-mandating.  Indeed, the Federal Circuit has "repeatedly recognized that the use of the word 'shall' generally makes a statute money-mandating."  *Agwia v. United States*, 347 F.3d 1375, 1380 (Fed. Cir. 2003) (citing *McBryde v. United States*, 299 F.3d 1357, 1361 (Fed. Cir. 2002); *Huston v. United States*, 956 F.2d 259, 261-62 (Fed. Cir. 1992); *Grav v. United States*, 886 F.2d 1305, 1307 (Fed. Cir. 1989)); *see also Lummi Tribe of the Lummi Reservation v. United States*, 99 Fed. Cl. 584, 594 (2011).  Because Section 1342 and its implementing regulations provide that the government "shall pay" and "will pay" the Risk Corridors Program Payments, these provisions mandate compensation by the government.  42 U.S.C. § 18062(b)(1); 45 C.F.R. § 153.510(b).  And so, Section 1342 and its implementing regulations are money-mandating sources of law upon which Blue Cross may rely to establish jurisdiction.

The Court is also not persuaded by the government's argument that that the Court should dismiss plaintiff's statutory claim for lack of subject-matter jurisdiction, because Blue Cross has no right to "presently due money damages" under Section 1342 and its implementing regulations.  Def. Mot. at 15-20.  As the government correctly states in its motion to dismiss, the Supreme Court held in *United States v. King*, that this Court's predecessor did not possess jurisdiction to consider a claim for declaratory relief because such a claim was not limited to "actual, presently due money damages from the United States."  395 U.S. 1, 3 (1969).  But, *King* is distinguishable from this case because *King* involved a claim for equitable, rather than monetary, relief.  *King*, 395 U.S. at 2-3; Compl. at ¶¶ 154-218.

In addition, as this Court recently recognized in *Land of Lincoln Mut. Health Ins. Co.  v. United States*, the Federal Circuit's decisions in *Todd* and *Annuity Transfers* similarly do not support dismissal of Blue Cross's statutory claim for want of jurisdiction.  *Land of Lincoln Mut.*

*Health Ins. Co. v. United States*, 129 Fed. Cl. 81, 97-98 (2016); *see also Todd v. United States*, 386 F.3d 1091, 1093-94 (Fed. Cir. 2004) (holding the Court has jurisdiction under the Tucker Act only when the money damages are "actual" and "presently due") (citing *Testan*, 424 U.S. at 398); *Annuity Transfers, Ltd. v. United States*, 86 Fed. Cl. 173, 179 (2009) (holding the Court has jurisdiction under the Tucker Act only if the settlement agreement upon which plaintiff's claim rests seeks "actual, presently due money damages from the United States") (citation omitted). *Todd* and *Annuity Transfers* both involve claims against the United States based upon contracts, rather than money-mandating statutes or regulations. *See Todd*, 386 F.3d at 1093-94; *Annuity Transfers, Ltd.*, 86 Fed. Cl. at 179.[5] And so, the Court does not read these cases to require that Blue Cross establish a right to actual, presently due money damages with respect to its claim pursuant to Section 1342 and its implementing regulations to establish jurisdiction.

Because Blue Cross has identified a money-mandating statute and money-mandating regulations to support its claim here, Blue Cross has no further obligation to establish jurisdiction. And so, the Court denies the government's motion to dismiss plaintiff's statutory claim for lack of subject-matter jurisdiction. RCFC 12(b)(1).

### 2. The Court May Consider Blue Cross's Contract And Takings Claims

The Court may also consider Blue Cross's contract and takings claims. Indeed, to the extent that Blue Cross asserts non-frivolous allegations of an express or implied-in-fact contract with the government, the Court may entertain these claims so long as the claims are for "actual, presently due money damages." *Speed v. United States*, 97 Fed. Cl. 58, 66 (2011) (quoting *King*, 395 U.S. at 3).[6]

---

[5] In *Todd*, the appellants sought back pay based upon alleged breaches of a collective bargaining agreement and memorandum of understanding. *Todd v. United States*, 386 U.S. 1091, 1093 (Fed. Cir. 2004). Similarly, in *Annuity Transfers*, the plaintiff alleged a breach of a settlement agreement with the government. *Annuity Transfers, Ltd. v. United States*, 86 Fed. Cl. 163, 179 (2009) (finding jurisdiction lacking under "presently due money damages" because the plaintiff brought suit to recover a lump-sum payment instead of periodic payments as provided for in the agreement with the government); *see also United States v. Testan*, 424 U.S. 392 (1976) (holding that the plaintiffs were not entitled to "presently due money damages" absent first obtaining equitable relief in the form of a retroactive classification to a higher pay grade).

[6] Unlike plaintiff's statutory claim, plaintiff's contract claims require a showing of presently due money damages to establish jurisdiction. *See Speed v. United States*, 97 Fed. Cl. 58, 66 (2011).

In Count II of the complaint Blue Cross alleges that it "entered into a valid written QHP agreement with CMS" regarding the Risk Corridors Program Payments.  Compl. at ¶ 167.  Blue Cross further alleges that it has implied-in fact contracts with the government regarding the Risk Corridors Program Payments, and that the government is "in breach of an implied covenant of good faith and fair dealing" under its express and implied-in-fact contracts, in Counts III and IV of the complaint.  *Id*. at ¶¶ 183, 202.  It is well established that the Court possesses jurisdiction to consider such claims under the Tucker Act.  28 U.S.C. § 1491(a)(1) (The Tucker Act grants this Court jurisdiction to consider claims based "upon any express or implied contract with the United States.");  *Aboo*, 86 Fed. Cl. at 626-27.

The Court may similarly entertain Blue Cross's claim that the government's failure to make full, annual Risk Corridors Program Payments "constitutes a deprivation and taking of Plaintiff's property interests."  Compl. at ¶ 217; s*ee* 28 U.S.C. § 1491(a)(1); *Morris v. United States*, 392 F.3d 1372, 1375 (Fed. Cir. 2004) ("[T]he Tucker Act provides the Court of Federal Claims exclusive jurisdiction over takings claims for amounts greater than $10,000.") (citation omitted); *see also Jan's Helicopter Serv., Inc.*, 525 F.3d at 1304 (citing *Eastern Enters.*, 524 U.S. at 520).  And so, the Court denies the government's motion to dismiss Blue Cross's contract and takings claims for lack of subject-matter jurisdiction.

### B.  Plaintiff's Claims Are Also Ripe

While Blue Cross has established that the Court possesses jurisdiction to consider its statutory, contract and takings claims, the Court may not adjudicate any of these claims if the claims are not ripe for judicial review.  *See, e.g.*, *Health Republic Ins. Co. v. United States*, 129 Fed. Cl. 757, 772 (2017).  The government argues in its motion to dismiss that Blue Cross's claims are unripe, because no money is presently due to Blue Cross under Section 1342 and because HHS has not yet completed the data analysis for the 2015 and 2016 Risk Corridors Program Payments.  Def. Mot. at 21-22.  Similar to its arguments with respect to jurisdiction, the government's ripeness arguments are unavailing.

It is well established that in determining whether a dispute is ripe for review, the Court must evaluate two factors: "(1) the 'fitness' of the disputed issues for judicial resolution; and (2) 'the hardship to the parties of withholding court consideration.'"  *Shinnecock*, 782 F.3d at 1348 (citing *Abbott Labs.*, 387 U.S. at 149; *Sys. Application & Techs., Inc.*, 691 F.3d at 1383-84);

*Caraco Pharm. Labs., Ltd.*, 527 F.3d at 1295 ("[A]n action is fit for judicial review where further factual development would not 'significantly advance [a court's] ability to deal with the legal issues presented.'") (citing *Nat'l Park Hospitality Ass'n v. DOI*, 538 U.S. 803, 812 (2003)).  In this case, Blue Cross seeks to recover all of its Risk Corridors Program Payments for calendar year 2014.  Compl. at Prayer for Relief.  There is no dispute that HHS has completed the data analysis for the Risk Corridors Program Payments owed to Blue Cross for that year.  Compl. at ¶¶ 135-38; Def. Mot. at 22.  It is also without dispute that HHS has already made a portion of the payments owed to Blue Cross for 2014.  Def. Mot. at 13-14; Compl. at ¶¶ 135-36.  Given this, plaintiff's claims seeking to recover the full amount of the 2014 Risk Corridors Program Payments are neither hypothetical nor in need of further factual development.  And so, this matter is fit for judicial review.

Withholding the Court's consideration of Blue Cross's claims would also cause a hardship to Blue Cross.  As Blue Cross argues in its opposition to the government's motion to dismiss, Blue Cross is owed almost $130 million in Risk Corridors Program Payments for calendar year 2014.  Pl. Opp. at 27.  This outstanding sum certainly imposes an immediate financial hardship on Blue Cross.  *See Caraco Pharm. Labs.*, 527 F.3d at 1295 (citing *Gardner*, 387 U.S. at 171) (A hardship exists where the complained-of conduct has an "immediate and substantial impact" on a party.).  And so, Blue Cross's claims are ripe and appropriate for judicial review.

### C. Blue Cross Fails To State Plausible Claims

#### 1. Blue Cross Fails To State A Plausible Statutory Claim

While ripe for judicial review, Blue Cross's claim pursuant to Section 1342 and its implementing regulations fails to state a plausible claim for relief.  In the complaint, Blue Cross alleges that it is "entitled under Section 1342(b)(1) of the ACA and 45 C.F.R. § 153.510(b) to recover full and timely mandated risk corridor payments from the Government for CY 2014."  Compl. at ¶ 160.  During oral argument, Blue Cross further clarified that it maintains that the deadline for this payment was December 2015.  Tr. 37:14-18.  And so, Blue Cross argues that "[t]he Government's failure to make full and timely risk corridor payments [by this deadline] . . . constitutes a violation and breach of the Government's mandatory payment obligations" under Section 1342(b)(1) and its implementing regulations.  *Id*. at ¶ 164; *see also* Pl. Opp. at 21-23.

The Government argues in its motion to dismiss that the Court should dismiss Blue Cross's statutory claim pursuant to RCFC 12(b)(6), because Section 1342 and its implementing regulations do not impose "a deadline for HHS to tender full risk corridor payments to [qualified health plain issuers]."  Def. Mot. at 16; 22-31.  The Court agrees that neither Section 1342 nor its implementing regulations impose an annual deadline for making the Risk Corridors Program Payments in full.  And so, the Court dismisses this claim pursuant to RCFC 12(b)(6).

A plain reading of Section 1342 demonstrates that Congress has not directly addressed the question of the timing of the Risk Corridors Program Payments in this statute.  Specifically, Section 1342(a) provides, in relevant part, that:

> In general−
>
> The Secretary shall establish and administer a program of risk corridors for calendar years 2014, 2015, and 2016 under which a qualified health plan offered in the individual or small group market shall participate in a payment adjustment system based on the ratio of the allowable costs of the plan to the plan's aggregate premiums.  Such program shall be based on the program for regional participating provider organizations under part D of title XVIII of the Social Security Act [Medicare Part D, 42 U.S.C. 1395w−101, *et seq*.].

42 U.S.C. § 18062(a).  Section 1342 also provides with respect to the payment methodology under the statute that:

> Payments out
>
> The Secretary shall provide under the program established under subsection (a) that if—
>
>> (A) a participating plan's allowable costs for any plan year are more than 103 percent but not more than 108 percent of the target amount, the Secretary shall pay to the plan an amount equal to 50 percent of the target amount in excess of 103 percent of the target amount; and
>>
>> (B) a participating plan's allowable costs for any plan year are more than 108 percent of the target amount, the Secretary shall pay to the plan an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target amount.

*Id.* § 18062(b)(1).  The above provisions demonstrate that Section 1342 neither addresses, nor establishes, a deadline for the payment of the Risk Corridors Program Payments.  And so, this statute is silent and, thus, ambiguous with respect to the timing of the Risk Corridors Program Payments.

When it enacted the ACA, Congress delegated authority to HHS to implement Section 1342.  42 U.S.C. § 18041 ("The Secretary shall, as soon as practicable after March 23, 2010, issue regulations setting standards for meeting the requirements under this title. . . .").  And so, HHS has filled the gap in Section 1342 regarding the timing of the Risk Corridors Program Payments through agency regulations and policy.

Specifically relevant to Blue Cross's claim here, HHS has promulgated regulations to implement the government's obligation to make the Risk Corridors Program Payments to issuers.  45 C.F.R. § 153.510.  These regulations provide, in relevant part, that:

> **§ 153.510  Risk  corridors  establishment  and  payment methodology.**
>
> (b) HHS payments to health insurance issuers. QHP issuers will receive payment from HHS in the following amounts, under the following circumstances:
>
>> (1) When a QHP's allowable costs for any benefit year are more than 103 percent but not more than 108 percent of the target amount, HHS will pay the QHP issuer an amount equal to 50 percent of the allowable costs in excess of 103 percent of the target amount; and
>>
>> (2) When a QHP's allowable costs for any benefit year are more than 108 percent of the target amount, HHS will pay to the QHP issuer an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target amount.

45 C.F.R. § 153.510(b).

A plain reading of the above regulations makes clear that HHS did not establish an annual deadline for the payment of the Risk Corridors Program Payments to insurers.  In fact, these regulations simply provide that HHS will make the Risk Corridors Program Payments to issuers if certain criteria are met regarding costs.  45 C.F.R. § 153.510(b).  And so, like Section

1342, these regulations provide no deadline with respect to when HHS must make the Risk Corridors Program Payments to issuers.[7]

Although Section 1342 and its implementing regulations are silent with respect to the timing of Risk Corridors Program Payments owed to issuers, HHS has addressed this issue through other agency policy. In this regard, a Risk Corridors and Budget Neutrality Bulletin from HHS, dated April 11, 2014, addresses the methodology that HHS will employ to make the Risk Corridors Program Payments owed to issuers in the event that the Risk Corridors Program collects less money than it is required to pay out under the program. Compl. at Ex. 20; Def. Mot. at 18-19. This bulletin provides, in relevant part, that:

> [I]f risk corridors collections are insufficient to make risk corridors payments for a year, all risk corridors payments for that year will be reduced pro rata to the extent of any shortfall. Risk corridors collections received for the next year will first be used to pay off the payment reductions issuers experienced in the previous year in a proportional manner, up to the point where issuers are reimbursed in full for the previous year, and will then be used to fund current year payments.

Compl. at Ex. 20. The bulletin also provides that:

> If, after obligations for the previous year have been met, the total amount of collections available in the current year is insufficient to make payments in that year, the current year payments will be reduced pro rata to the extent of any shortfall. If any risk corridors funds remain after prior and current year payment obligations have been met, they will be held to offset potential insufficiencies in risk corridors collections in the next year.

*Id.* This policy allows HHS to make pro-rata Risk Corridors Program Payments to issuers during a particular program year. But, the policy also requires that the agency to make up any shortfall in those payments during the subsequent years of the program, as additional funds are collected.

---

[7] It is also notable that although HHS has established a 30-day deadline for issuers to make Risk Corridors Program Payments to HHS, HHS declined to establish such a deadline for the Risk Corridors Program Payments that are owed to issuers. *See* 45 C.F.R. § 153.510(d) ("A QHP issuer must remit charges to HHS within 30 days after notification of such charges."). The absence of such a deadline with respect to the payments owed to issuers indicates that HHS did not intend to establish an annual deadline for its payment of the Risk Corridors Program Payments.

Given Congress's express and broad delegation of authority to HHS to implement the Risk Corridors Program, HHS's policy regarding the timing of the Risk Corridors Program Payments is reasonable and consistent with Section 1342.  42 U.S.C §§ 18041, 18062.  The policy affords HHS the full three years of this temporary program to make up any shortfall in the Risk Corridors Program Payments as funds become available.  Given the absence of a statutory deadline for making the Risk Corridors Program Payments to issuers—and the temporary nature of the Risk Corridors Program—HHS's policy is sound and consistent with Section 1342. *Chevron*, 467 U.S. at 842-43.  And so, the Court concludes that HHS has no obligation under Section 1342 or its implementing regulations to pay the full amount of Blue Cross's 2014 Risk Corridors Program Payments until, at a minimum, the agency completes its calculations for payments due for the final year of the Risk Corridors Program.  During oral argument, the parties acknowledged that this deadline will not occur until December 2017 or January 2018.  Tr. 26: 19-25.

The Court is also not persuaded by Blue Cross's argument that the government's pro-rata Risk Corridors Program Payments pursuant to the aforementioned policy undermine the purpose of the Risk Corridors Program.  Pl. Opp. at 21-23; Pl. Supp. Br. at 5-10.  As the government argues in its reply brief, pro-rata Risk Corridors Program Payments satisfy the stated purpose and objectives of the Risk Corridors Program, by protecting issuers from uncertainties regarding the cost of health insurance claims during the first three years of the ACA's Exchanges.  *See* Def. Reply at 9-10.  In fact, Blue Cross acknowledges in the complaint that it decided to continue to participate in the Risk Corridors Program despite HHS's announcement that the government would provide only pro-rata Risk Corridors Program Payments if the collections for a particular year could not satisfy the payments due.  Compl. at ¶¶ 42-43; *see also* Compl. at Ex. 3-4.

Blue Cross's argument that Section 1342 and its implementing regulations require full, annual Risk Corridors Program Payments because Section 1342 is based upon Medicare Part D is equally unavailing.  Compl. at ¶¶ 7, 30; Pl. Opp. at 21-22, 30.  While there is no dispute that the Risk Corridors Program is based upon Medicare Part D, this fact, alone, does not demonstrate that Congress intended for HHS to pay the Risk Corridors Program Payments owed to issuers in full, upon an annual basis.  In fact, the Court is not aware of—and plaintiff has not cited to—any requirement in Section 1342 or elsewhere in the ACA that HHS must administer the Risk Corridors Program in the same manner as the Medicare Part D risk corridors program.

In addition, the fact that HHS calculates the amount of Risk Corridors Program Payments due and owed for each year under the three-year Risk Corridors Program similarly fails to establish the existence of an obligation upon the part of HHS to make full Risk Corridors Program Payments upon an annual basis.  Pl. Opp. at 22.  Rather, as both parties acknowledged during oral argument, any deadline for making the Risk Corridors Program Payments to issuers could be no earlier than the December of the following year, because HHS must accommodate state-operated reinsurance and risk adjustment programs and include risk adjustment and reinsurance payments received in the calculation of risk corridors charges and payments.  Tr. 14:16-24, 37:14-18; Def. Mot. at 17.  And so, HHS has reasonably exercised its discretion with respect to the timing of Risk Corridors Program Payments to issuers, by making a pro-rata payment and requiring that the government make up any outstanding payments owed during the subsequent years of the program.

In sum, the plain language of Section 1342 and its implementing regulations provides no deadline for HHS to make the Risk Corridors Program Payments to Blue Cross.  Blue Cross conceded this point, as it must, during oral argument.  Tr. 45:23-25, 46:1-2.  Rather, HHS has acted reasonably and consistent with Section 1342 and its implementing regulations by making pro-rata Risk Corridors Program Payments and committing to make up any shortfall in those payments during subsequent program years.  Given this, the Risk Corridors Program Payments owed to Blue Cross for calendar year 2014 are not "presently due."  For this reason, the Court must dismiss Count I of the complaint.  RCFC 12(b)(6).

### 2.   Blue Cross Fails To State A Plausible Express Contract Claim

The Court must also dismiss Count II of the complaint, because Blue Cross fails to state a plausible express contract claim.  In Count II of the complaint, Blue Cross alleges that its QHP Agreement with CMS requires that HHS make full, annual Risk Corridors Program Payments.  Compl. at ¶¶ 166-79.  But, a plain reading of the complaint and the QHP Agreement shows, that Blue Cross's express contract claim fails as a matter of law.

First, to the extent that Blue Cross alleges that the government is contractually obligated to make full, annual Risk Corridors Program Payments, because Section 1342 and its implementing regulations have been incorporated into its QHP Agreement, this claim is not

viable.  As discussed above, neither Section 1342, nor its implementing regulations, require that HHS make full, annual Risk Corridors Program Payments.

In addition, the contractual provisions that Blue Cross relies upon to show that HHS is contractually obligated to make full, annual Risk Corridors Program Payments cannot be reasonably read to create such an obligation.  Specifically, Blue Cross relies upon section II, paragraph d of its QHP Agreement, which pertains to the acceptance of standard rules of conduct for QHP issuers and provides in relevant part, that:

> CMS will undertake all reasonable efforts to implement systems and processes that will support QHPI functions.  In the event of a major failure of CMS systems and processes, CMS will work with QHPI in good faith to mitigate any harm caused by such failure.

Compl. at Ex. 2 at § II, ¶ d.  But, this provision plainly does not require that HHS make the Risk Corridors Program Payments.

Section V, paragraph g of the QHPI Agreement, upon which Blue Cross also relies, similarly fails to address, or to require full, annual Risk Corridors Program Payments.  Rather, this provision pertains to governing law and provides, in relevant part, that:

> This Agreement will be governed by the laws and common law of the United States of America, including without limitation such regulations as may be promulgated from time to time by the Department of Health and Human Services or any of its constituent agencies, without regard to any conflict of laws statutes or rules.

Compl. at Ex. 2 at § V, ¶ g.  Again, to the extent that this provision can be read to incorporate Section 1342 and its implementing regulations, these legal provisions do not require full, annual Risk Corridors Program Payments.  And so, because no reasonable reading of the contractual provisions that Blue Cross cites would show a contractual obligation upon the part of HHS to make full, annual Risk Corridors Program Payments, the Court must dismiss Count II of the complaint.  RCFC 12(b)(6).

### 3.   Blue Cross Fails To State A Plausible Implied-In-Fact Contract Claim

Blue Cross similarly fails to state a viable implied-in-fact contract claim.  In this regard, Blue Cross alleges that "the combination of [Section] 1342, 45 C.F.R. § 153.510, and the Government's conduct before and after Plaintiff agreed to become a QHP for CY 2014, all

support a reasonable inference that the Government entered into implied-in-fact contracts obligating it to pay CY 2014 risk corridors payments in full by the end of CY 2015." Pl. Opp. at 46; *see also* Compl. at ¶¶ 180-98. And so, Blue Cross maintains that the government materially breached these implied-in-fact contracts by failing to make full, annual Risk Corridors Program Payments. *Id.* at ¶ 197. Blue Cross's implied-in-fact contract claim is not plausible.

As an initial matter, Blue Cross's implied-in-fact contract claim is based upon Section 1342, and Blue Cross cannot overcome the general presumption that Congress did not intend for the statutory obligations set forth in Section 1342 to contractually bind the government. To allege a plausible implied-in-fact contract claim here, Blue Cross must show, among other things, mutual intent on the part of the parties to contract with respect to the Risk Corridors Program Payments. *Kam-Almaz*, 682 F.3d at 1368 (To establish the existence of either an express or implied-in-fact contract with the United States, a plaintiff must show: (1) mutuality of intent; (2) consideration; (3) lack of ambiguity in the offer and acceptance; and (4) actual authority to bind the government in contract on the part of the government official whose conduct is relied upon.).

This Court has also long recognized that "[t]here is a general presumption that statutes are not intended to create any vested contractual rights." *ARRA Energy Co. I*, 97 Fed. Cl. at 27 (2011). And so, to determine whether Blue Cross can overcome such a presumption here, the Court must look to the text of Section 1342 to determine whether this statute contains specific language that creates a contract. *Brooks v. Dunlop Mfg. Inc.*, 702 F.3d 624, 631 (Fed. Cir. 2012). If not, the Court may also look to whether the circumstances surrounding the passage of Section 1342 manifest such an intent to bind the government contractually. *Id.*

Neither Section 1342 nor its implementing regulations contain language that creates a contractual obligation with respect to the Risk Corridors Program Payments. Section 1342 and its implementing regulations do mandate the payment of the Risk Corridors Program Payments under the ACA's Risk Corridors Program. But, these provisions do not contain any language to create a contractual obligation for HHS to make these payments. And so, the Court must look to the circumstances surrounding the enactment of the ACA to determine whether there is any evidence that Congress, nonetheless, intended to contractually bind the government with respect to the Risk Corridors Program Payments. *Id.*

In this regard, Blue Cross does not identify any circumstances surrounding the enactment of the ACA that would manifest an intent upon the part of Congress to contractually bind the government. Rather, Blue Cross points to "the Government's conduct before and after [Blue Cross] agreed to become a QHP for CY 2014" to show that the parties entered into implied-in-fact contracts regarding the Risk Corridors Program Payments. Pl. Sur-Reply at 17.

When this Court has previously examined whether the circumstances surrounding a statute passage manifest an intent to contract, the Court has looked to the conduct of Congress and the President in enacting and signing that statute. For example, in *ARRA Energy*, the Court considered whether Congress's intent to contract could be inferred from the conduct of Congress and the President in enacting and signing the American Recovery and Reinvestment Act. *ARRA Energy Co. I*, 97 Fed. Cl. at 27. Similarly, in *Brooks*, the Federal Circuit looked to the legislative history and other evidence during the passage of the Leahy-Smith America Invents Act, Pub. L. 112-29, 125 Stat 284 (2011), to determine whether the circumstances surrounding the passage of that statute manifested Congressional intent to contractually bind the government. *Brooks*, 702 F.3d at 631.

But, here, the alleged conduct and statements that Blue Cross relies upon to establish implied-in-fact contracts with the government occurred several years after the enactment of the ACA. Compl. at ¶¶ 89-105, 182; Pl. Opp. at 21-22. For example, Blue Cross alleges that the statements, letters and emails that it received from CMS in 2015 manifest Congressional intent to contractually bind the government. Compl. at ¶¶ 99-105, 182.[8]

---

[8] The government also argues persuasively that Blue Cross's reliance upon the United States Claims Court's decision in *New York Airways v. United States* to support its implied-in-fact contract claim is misplaced. In *New York Airways*, our predecessor Court held that the actions of the parties in that case could support the existence of an implied-in-fact contract requiring the United States Federal Aviation Administration to make certain subsidy payments to compensate helicopter companies for the transport of U.S. mail. *New York Airways v. United States,* 369 F.2d 743, 751-52 (1966). The Claims Court also held that Congressional intent to contractually bind the government for these payments could be inferred from the Independent Offices Appropriation Act and the Second Supplemental Appropriation Act for fiscal year 1965. *Id*. at 752 ("That Congress recognized the contract nature of the subsidy payments is inferred by the title 'Payments to Air Carriers (Liquidation of Contract Authorization),' which was given to the subsidy appropriations in [the appropriations legislation]."). *New York Airways* is, however, factually distinguishable from this case, because the Risk Corridors Program Payments are made in connection with administering the Risk Corridors Program, rather than payments for particular goods or services.

More importantly, even if the Court were to accept Blue Cross's allegation that it has entered into implied-in-fact contracts with the government regarding the Risk Corridors Program Payments as true, Blue Cross cannot show that the government breached such contracts in this case.  As discussed above, neither Section 1342 nor its implementing regulations set an annual deadline for the Risk Corridors Program Payments.  Given this, Blue Cross has not–and cannot– establish that the government breached an implied-in-fact contract based upon Section 1342 by failing to make full, annual 2014 Risk Corridors Program Payments.  Def. Supp. Br. at 9; Tr. 62:18-25, 63: 1-2; RCFC 12(b)(6).

### 4.   Blue Cross Fails To State A Plausible Implied Covenant Claim

Because the Court concludes that Blue Cross has not alleged plausible express or implied-in-fact contract claims in the complaint, the Court must also dismiss Blue Cross's claim for breach of the implied covenant of good faith and fair dealing.  The Federal Circuit has recognized that every contract imposes upon the parties a duty of good faith and fair dealing and that the failure to fulfill that duty constitutes a breach of that contract.  *Metcalf Constr. Co. v. United States,* 742 F.3d 984, 990. (Fed. Cir. 2014) (citations omitted).  But, such an implied covenant cannot expand the parties' contractual duties beyond those existing in the contract, or create duties that are inconsistent with that contract.  *Id*. at 991 (citation omitted).

Blue Cross alleges in Count IV of the complaint that "[b]y failing to make full and timely CY 2014 risk corridor payments to [Blue Cross], the United States . . . [is] in breach of an implied covenant of good faith and fair dealing" under its alleged express and implied-in-fact contracts.  Compl. at ¶ 202.  But, the absence of either an express or implied contractual obligation upon the part of HHS to make the Risk Corridors Program Payments in full, upon an annual basis, precludes Blue Cross from establishing any right under an implied covenant of good faith and fair dealing.  And so, the Court must also dismiss Count IV of the complaint. RCFC 12(b)(6).

### 5.   Blue Cross Fails To State A Plausible Takings Claim

The Court must also dismiss Blue Cross's takings claim, because Blue Cross cannot demonstrate that it has a cognizable property interest in full, annual Risk Corridors Program Payments.  In this regard, the Federal Circuit has long held that a plaintiff must have a cognizable property interest to state a viable Fifth Amendment takings claim.  *Adams v. United*

*States*, 391 F.3d 1212, 1218 (Fed. Cir. 2004) (In evaluating a takings claim, the Court first determines whether the claimant possessed a cognizable property interest in the subject of the alleged taking for purposes of the Fifth Amendment.) (citations omitted).  While Blue Cross alleges that it "has a vested property interest in its contractual, statutory, and regulatory rights to receive" full, annual Risk Corridors Program Payments, neither Section 1342 nor its implementing regulations—nor any alleged contract by and between Blue Cross and the government—obligates the government to make full, annual Risk Corridors Program Payments. Compl. at ¶ 213.  And so, Blue Cross simply cannot show that it has a cognizable contractual, statutory, or regulatory right to receive full, annual Risk Corridors Program Payments.  RCFC 12(b)(6).

### D.   The Court May Not Consider Blue Cross's Claim For Declaratory Relief

As a final matter, the Court must also dismiss Blue Cross's request "that the Court declare, as incidental to [a] monetary judgment, that based on the Court's legal determinations as to the Government's CY 2014 risk corridor payment obligations, the Government must make full and timely CY 2015 and CY 2016 risk corridor payments to Plaintiff if Plaintiff experiences losses during those years."  Compl. at Prayer for Relief.  Such relief is not incident of, or collateral to, any monetary judgment related to Blue Cross's 2014 Risk Corridors Program Payments.

This Court has long recognized that the Tucker Act provides the Court with jurisdiction to grant equitable or declaratory relief in limited circumstances.  *See Annuity Transfers*, 86 Fed. Cl. at 181.  Relevant to the present matter, the Court may "issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records" as an "incident of and collateral to" a monetary judgment.  28 U.S.C. § 1491(a)(2).  But, the declaratory relief that Blue Cross seeks here is not incident of or collateral to a monetary judgment regarding its 2014 Risk Corridors Program Payments.  Rather, such declaratory relief pertains to Risk Corridors Program Payments for 2015 and 2016, and those payments are not at issue in this litigation.[9]  In addition, the Court has determined that Blue

---

[9] During oral argument, Blue Cross informed the Court that it withdraws its claim for declaratory relief with respect to the 2016 Risk Corridors Program Payments.  Tr. 101:7-13.  Blue Cross further advised

Cross has no right to full, annual Risk Corridors Program Payments under Section 1342 and its implementing regulations.  Given this, the declaratory relief that Blue Cross seeks is also unwarranted based upon the circumstances of this case.  And so, the Court must also dismiss plaintiff's claim for declaratory relief.[10]

## V.    CONCLUSION

In sum, while the Court possesses jurisdiction to consider Blue Cross's statutory, contract and takings claims to recover the full amount of its Risk Corridors Program Payments for 2014 in this action, Blue Cross fails to state plausible claims for relief.  As Blue Cross acknowledged during oral argument, there is no requirement in Section 1342 or its implementing regulations that HHS make these payments in full by December 2015.  As a result, Blue Cross fails to show that it is entitled to presently due money damages from the government.

In reaching the decision to dismiss this action, the Court concludes only that the government has no obligation to make full, annual Risk Corridors Program Payments and that the government may continue to make up any shortfall in plaintiff's 2014 Risk Corridors Program Payments until HHS completes its data calculations and collections for the final year of the Risk Corridors Program.  And so, the Court does not reach the question of whether the government may, ultimately, limit such payments to the amount of collections under that program.

Because Blue Cross's claim for declaratory relief regarding its 2015 Risk Corridors Program Payments is not incidental of or collateral to plaintiff's claim for monetary relief in this action, the Court also dismisses this claim.

---

that it would seek to amend the complaint with regards to plaintiff's request for declaratory relief regarding the 2015 Risk Corridors Program Payments.  Tr. 101:13-18.

[10] Although the Court does not reach the question of whether the Risk Corridors Program Payments are an obligation to pay money under a statutory benefits program, the Federal Circuit has held that an obligation to pay money under a statutory benefit program does not create a cognizable property interest. *Adams v. United States*, 391 F.2d 1212, 1223-24 (Fed. Cir. 2004).  Because the Court concludes that the government has no obligation to make full, annual Risk Corridors Program Payments under Section 1342 and its implementing regulations, and that HHS's policy with respect to the timing of those payments is reasonable and consistent with Section 1342, the Court does not reach the issue of whether Section 1342 mandates Risk Corridors Program Payments in excess of collections.

And so, for the foregoing reasons, the Court:

1.   **GRANTS-IN-PART** and **DENIES-IN-PART** the government's motion to dismiss; and

2.   **DISMISSES** the complaint.

The Clerk shall enter judgment accordingly.

The parties shall bear their own costs.

 **IT IS SO ORDERED.**

<u>s/ Lydia Kay Griggsby</u>
LYDIA KAY GRIGGSBY
Judge